UNITED STATES of America,
Plaintiff-Appellee,

v.

Dohn Ardell PATTERSON,
Defendant-Appellant.

No. 85–2535.

United States Court of Appeals,
Fifth Circuit.

June 24, 1986.

Carl Robin Teague, San Antonio, Tex., for defendant-appellant.

Michael R. Hardy, Wayne F. Speck, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, RUBIN, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The issue presented is whether the federal arson statute [1] applies to the intentional destruction of three partially completed buildings that were to contain twelve units and were part of a 78-unit, eleven-building residential condominium project being built for sale. Guided by the Supreme Court decision in *United States v. Russell,*[2] and the Ninth Circuit opinion in *United States v. Andrini,*[3] we hold that the statute applies and affirm the conviction of the defendant.

## I.

Roanoke, Ltd. (Roanoke), a Texas limited partnership, was constructing for ultimate sale 78 condominium units, which were to be contained in eleven separate buildings. Dohn Patterson, a security guard at the site, set a fire that destroyed twelve par-

tially constructed condominium units in Building 11. This building, like buildings 9 and 10, was 45–50% complete at the time of the fire. Each of these buildings had roof decking, exterior walls, some interior wall work and wall wiring, bathtubs, and fireplaces, but no sheetrocking, insulation, or electricity. Buildings 1 through 8 were 75–80% finished. No one occupied or resided in any of the buildings, although Roanoke's security staff utilized the clubhouse at the front of the condominium project.

Roanoke's general partner, Roanoke Development Company, is a Texas general partnership. Some of the limited partners of Roanoke reside in Texas, others live outside the state. In order to build the residential units, Roanoke borrowed $7.7 million from Savers Federal Savings and Loan Association, located in Little Rock, Arkansas, and the loan was secured by a deed of trust covering the entire condominium project.

## II.

It is a federal criminal offense to maliciously damage or destroy by means of fire any building or other real or personal property used in interstate commerce or in any activity affecting interstate commerce.[4] The issue presented is two-fold: whether the property was "used," and, if so, whether such use was in "an activity affecting interstate commerce."

The Government contends that the partially constructed buildings were "property used in connection with housing construction activity," that housing construction, generally, is an activity affecting interstate commerce, and that, therefore, the statutory elements of the crime have been satisfied. It reinforces the housing construction *per se* link to interstate commerce with

1. 18 U.S.C. § 844(i) reads, in pertinent part, "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate ... commerce or in any activity affecting interstate ... commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both."

2. —— U.S. ——, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985).

3. 685 F.2d 1094 (9th Cir.1982).

4. 18 U.S.C. § 844(i).

further possible connections: the out-of-state financing of the construction project; the advance of funds by a federally-regulated lender; the participation of out-of-state limited partners; and, finally, the destined sale of the condominium units to buyers who might reside outside the State of Texas.

Patterson does not challenge the power of Congress under the commerce clause to forbid arson of such multi-occupant residential units. Nor does he dispute that the statutory language, "activity affecting interstate commerce," was employed with the intent to exercise Congress' full power under the commerce clause. He urges, instead, that the units had not been and were not "used" in any such activity.

### A.

■ Viewed as *res nova*, Patterson's argument is plausible. The word "used," of course, suggests that the property in question must, in some way, be devoted to the service of some purpose, for example, used for storage, used as a display model, used as the headquarters of a business. In the context of § 844(i), the purpose must be related to interstate commerce. It is difficult to perceive how, in a purely semantic and narrowly literal sense, these partially constructed units were being "used" for anything, save possibly as security for a construction loan. They were simply being constructed for later "use." *United States v. Russell* and *United States v. Andrini*, however, appear to us to preclude such a restrictive interpretation of the word "used" as it is employed in § 844(i).

The issue presented in *Russell* was whether the federal arson statute applied to a two-unit rental apartment building. The Court found that the statutory language and its legislative history expressed Congress' intent "to exercise its full power under the Commerce Clause."[5] It stated, "Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home."[6] The Court further found that "the rental of real estate is unquestionably"[7] an activity affecting interstate commerce and, since Russell rented out apartments in the building, that is, used the building as rental property, the "use" element of the statute was satisfied. The Court in *Russell* noted that "by its terms, ... the statute only applies to property that is 'used' in an 'activity' that affects commerce."[8]

Patterson asserts that in his case, unlike in *Russell*, the partially constructed buildings were not being "used." The facts of *Russell*, however, did not require the Court to decide in what manner the term "used" restricted the scope of § 844(i).

Before *Russell*, the Ninth Circuit in *United States v. Andrini*[9] had discussed the meaning of the term "used." In *Andrini*, an office building under construction was damaged by a deliberately set fire. The court in *Andrini* was concerned primarily with finding the requisite link to interstate commerce. It specifically held that "construction of a commercial office building *using out-of-state materials* is a commercial activity affecting interstate commerce for the purpose of § 844(i)."[10] It noted that its narrow holding did not necessitate reaching the Government's argument that "because the construction industry [*per se*] affects interstate commerce, the destruction of property under construction automatically satisfies § 844(i)."[11] It added: "The 'used in' language seems to have been inserted only to make certain that the building or property

5. —— U.S. ——, 105 S.Ct. at 2456.

6. *Id.* at ——, 105 S.Ct. at 2457.

7. *Id.* at ——, 105 S.Ct. at 2458.

8. *Id.* at ——, 105 S.Ct. at 2457.

9. 685 F.2d 1094 (9th Cir.1982).

10. *Id.* at 1096.

11. *Id.* n. 2.

*has some relationship* to an activity of commercial nature." [12]

Patterson argues that *Andrini* is distinguishable because the government had offered evidence that out-of-state building materials were *stored* at the site of the incomplete building, and that therefore the decision may be read as holding that the "use" of the burned building was the storage of the builder's inventory. The opinion read as a whole, however, belies Patterson's clever, albeit somewhat strained, argument. *Andrini* clearly states that the proper interpretation of the word "used" in the statute merely requires "some relationship," some connection, to an activity affecting interstate commerce.

■ The interpretation adopted by the court in *Andrini* appears to conform to Congress' intention without distorting the words of the statute. It is doubtful Congress meant § 844(i) to cover building materials *used* to construct a building and buildings *used,* say, to house tenants and procure rental income (as in *Russell*), but meant to exclude from coverage a partially completed structure. Though, generally, criminal statutes are to be narrowly construed, they are not to be interpreted in a way that makes their coverage irrational.[13] We therefore find that the partially completed condominium units in question here were "used" within the meaning of the statute, in the sense that the damaged property had "some relationship" to an activity alleged to affect interstate commerce.

■ We note, however, that because building projects of this nature almost undoubtedly utilize materials shipped in interstate commerce, it should be easy for prosecutors to avoid interpretative problems of the sort discussed above, as well as resort to barely plausible *per se* arguments that attempt to make an essential element of an offense a legal rather than a factual question, by offering proof of the origin of the materials and, perhaps, the particulars of the construction contracts undertaken pursuant to the project. "Use" in an activity affecting commerce would then follow from the "use" of the buildings as a destination for the materials. An ounce of evidence might obviate the need for an appellate pound.

### B.

With regard to the requisite interstate commerce nexus, the Government's primary argument is that housing construction is by its nature an activity affecting interstate commerce, in much the same way the Court in *Russell* found the rental housing market an activity that "unquestionably" affects interstate commerce. Patterson counters that the evidence presented by the Government to prove the interstate commerce link was not sufficient to support his conviction. We may reverse the trial court's finding of guilt only if we can conclude, viewing the evidence in the light most favorable to the Government, that a reasonable trier of fact could not have found that the evidence established guilt beyond a reasonable doubt.[14]

■ Housing construction is certainly a commercial activity. And, as the Ninth Circuit commented in the context of the Fair Labor Standards Act, "any construction work [for business purposes], regardless of the size or duration of the project, is likely to have an effect on interstate commerce" through the "flow of men, money, and materials across state lines." [15] The

---

**12.** *Id.* at 1095–96 (citing *United States v. Mennuti,* 639 F.2d 107, 109–10 (2d Cir.1981)).

**13.** *See Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *Barber v. Gonzales,* 347 U.S. 637, 642–43, 74 S.Ct. 822, 825, 98 L.Ed. 1009 (1954); *cf. United States v. Monholland,* 607 F.2d 1311, 1315 (10th Cir. 1979) ("The history of 18 U.S.C. § 844(i) indicates that the commerce requirement contained therein is to be broadly construed.").

**14.** *United States v. Colwell,* 764 F.2d 1070, 1072 (5th Cir.1985); *United States v. Webb,* 747 F.2d 278, 282 (5th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *United States v. Giordano,* 693 F.2d 245, 250 n. 5 (2d Cir.1982).

**15.** *Donovan v. S & L Development Co.,* 647 F.2d 14, 18 (9th Cir.1981) (citation omitted); *see also NLRB v. International Union of Operating Engi-*

fact that Congress would undoubtedly have the power, pursuant to the commerce clause, to regulate housing construction projects of the Roanoke type does not mean, however, that the interstate commerce element of a § 844(i) offense is automatically satisfied. We reject the Government's attempt to have us hold, as a matter of law, that the burning of any building under construction satisfies the statute's interstate commerce element. We, therefore, consider the sufficiency of the other evidence proffered by the Government, keeping in mind the mandate of *Russell* that the language, "in an activity affecting interstate commerce," is to be generously construed.

Turning to the evidence, the Government urges that the interstate financing of the housing project by a federally regulated lender and the size of the loan, seven million dollars, supports its claim that the requisite nexus has been established. It also points to the out-of-state partners and the intention to sell the condominium units to any person or company interested.

The Fourth Circuit relied on interstate financing of personal property to find coverage in *United States v. Grossman,*[16] but in that case the evidence also showed that the damaged property had been manufactured in another state, had been owned by non-residents, had been insured by an out-of-state insurance company, had been held for sale to "anybody, anywhere," and had been advertised to that effect in a periodical published out-of-state.[17]

Countering, Patterson attempts to rely on the Second Circuit's decision in *United States v. Mennuti.*[18] The court there held that private dwelling houses not used for any commercial purpose would not support jurisdiction, notwithstanding such interstate contacts as financing, insurance, fueling, and use of building materials.[19] Significantly, however, Roanoke's project was a commercial venture, not simply a private residence. Moreover, the *Russell* analysis casts doubt on the *Mennuti* reasoning that the property involved must be devoted to commercial purposes before § 844(i) applies. In *Russell* the Court stated that Congress "intended to protect all business property, as well as some additional property,"[20] and suggested that the statute may cover some churches as well as certain private homes.[21]

It appears the only case other than *Mennuti* to find that the destroyed property lacked the necessary nexus to interstate commerce was the Tenth Circuit decision in *United States v. Monholland,*[22] which involved a destroyed automobile used by a state judge. The vehicle was used by the judge only to travel to and from work and was never driven interstate. The government in *Monholland* did not argue that the auto's probable out-of-state origin and subsequent sale established a sufficient link to an activity affecting commerce; instead it argued that the judge's job of handling cases involving out-of-state parties sufficed to establish the interstate commerce link.[23] The court found that the auto was not covered by § 844(i) because it was not commercial property. This decision provides

---

*neers, Local 571,* 317 F.2d 638, 643 & n. 5 (8th Cir.1963).

**16.** 608 F.2d 534 (4th Cir.1978).

**17.** *Id.* at 537; *see also United States v. Nashawaty,* 571 F.2d 71, 75 (1st Cir.1978); *United States v. Belcher,* 577 F.Supp. 1241, 1245 (E.D.Va. 1983).

**18.** 639 F.2d 107 (2d Cir.1981); *see also United States v. Barton,* 647 F.2d 224, 232 n. 8 (2nd Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

**19.** 639 F.2d at 109–10.

**20.** —— U.S. at —— nn. 6 & 7, 105 S.Ct. at 2457 nn. 6 & 7.

**21.** *See id.* at —— & nn. 5–7, 105 S.Ct. at 2457 & nn. 5–7; *cf. United States v. Fears,* 450 F.Supp. 249, 252–53 (E.D.Tenn.1978).

**22.** 607 F.2d 1311, 1316 (10th Cir.1979); *cf. United States v. Michaels,* 726 F.2d 1307, 1310 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

**23.** 607 F.2d at 1315.

little support for Patterson. The facts of his case are simply not analogous.

While Russell was renting his apartment building to tenants at the time he attempted to destroy it by fire, and Roanoke was building for sale, Roanoke's activity was a significant business venture involving out-of-state partners and financing by an out-of-state lender. As to Roanoke, the condominiums were business property. Although we find the Government's marshalling of evidence in this case to be less than satisfactory, viewing the evidence in the light most favorable to it, we conclude that a reasonable trier of fact might have found that the Government had established the interstate commerce link beyond a reasonable doubt. Therefore, under the specific facts presented, we cannot say that the trial judge, sitting as both trier of fact and law, erred in finding Patterson was guilty of the offense charged.

For these reasons, the judgment of conviction is AFFIRMED.