IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-30238

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH CORONA, III; LINDSEY McDONALD,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

March 12, 1997

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

These federal arson convictions raise primarily Commerce Clause and double jeopardy concerns. We conclude that the convictions are within Congress's commerce power. But we find that imposing separate sentences for arson, conspiracy to commit arson, and "using fire to commit conspiracy to commit arson" violated the Double Jeopardy Clause. We vacate the sentences and remand for re-sentencing.

I.

In February of 1992, Joseph Corona, III, bought a two-story residential structure at 1637 Polymnia Street in New Orleans for $29,000. He insured the house for $45,000, assigned title to the property to his mother, and made monthly payments of around $450 on

her behalf to the previous owner. His plan was to renovate the building and turn it into a bed-and-breakfast or a youth hostel. But that would require special permission from the city, which Corona was having trouble obtaining. Along with two acquaintances, V.J. Stock and Lindsey McDonald, Corona undertook sporadic renovations at a total cost of between $15,000 and $20,000.

By the beginning of 1995, Corona turned sour on the project. Twice he offered to sell the building to James Hudson, once in exchange for a taxi number worth about $25,000. Two days before the fire, when Hudson declined the second offer, Corona told Hudson: "I guess I'll do what I got to do." Wayne Conino, a former roommate, testified that Corona announced that he wanted "out of the house." Corona asked his father-in-law how to set a fire without being caught. Toward the end of 1994, Corona also expressed his economic hardship to his mother-in-law, who testified that "for quite awhile, every once in awhile, he would mention that he was going to have to burn the house."

On February 6, 1995, he did just that. He picked up McDonald and Stock in a New Orleans suburb and dropped them off a few blocks from the house. Suzanne Guidroz, a United Cab telephone operator, was visiting with her boyfriend at the nearby United Cab dispatching station and could see the house through a window. She testified that Stock and McDonald made many trips up and down an exterior staircase. At one point, she watched McDonald use an outdoor pay phone just outside of the United Cab building. When the two men carried a mattress down the stairs and deposited it on

2

the first floor, she brought the unusual behavior to the attention of a nearby worker. Less than a minute later, the house virtually exploded. Guidroz called 911, reported the fire, and explained that she thought that two men were still in the building. But apparently McDonald and Stock had already fled the scene.

The flames quickly spread to the "shack," a warehouse at 1722 Carondelet Street owned by Mario Greco, a United Cab employee. Greco stored taxis in the building and rented part of it out to United Cab for $600 per month. The shack contained an employee break room with vending machines, a television, and tables and chairs where employees played cards. United Cab furnished the building in part because workers needed a safe place to relax in a relatively dangerous neighborhood. Only a few feet separated Corona's house from the shack, which was in flames even before firefighters arrived. More than a dozen people, including a dispatcher and several cab drivers, had to be evacuated from the warehouse in the seven-alarm fire. The shack's roof collapsed, and one of the cabs stored there was destroyed.

McDonald and Stock returned to the house around 5:00 A.M., while investigators were sifting through the remains of the house and the shack. Guidroz was still at the scene. She immediately pointed the men out to an investigator. McDonald admitted at trial that he lied to law enforcement officers when he told them that he knew nothing about the fire. Later that morning, Corona gave McDonald a ride back to the suburbs and provided him with a place to sleep. McDonald also admitted at trial that he lied after his

arrest when he told an investigator that Stock had accidentally caught a blanket on fire, was unable to put it out, and left the house to meet Corona and McDonald in the French Quarter.

A grand jury indicted each of the three men on three counts: conspiracy to commit arson (18 U.S.C. § 371), maliciously burning buildings used in or affecting interstate commerce (18 U.S.C. § 844(i)), and, as the indictment put it, "knowingly us[ing] fire to commit conspiracy to commit arson as alleged in Count 1" (18 U.S.C. § 844(h)(1)). Stock became a fugitive and was not arrested until September of 1996. Corona and McDonald stood trial.

Much of the government's case consisted of the testimony of experts who explained that the fire fit the profile of arson. An ATF agent described how investigators discovered that the fire began in three separate places. A burned mattress was on the ground floor. A city investigator told the jury that he had taken a trained and certified dog into the burned structure and that the dog had detected traces of accelerants in the three places where the fire began. An expert using a gas chromatograph discovered gasoline on a blanket in the house. Another ATF agent found burning patterns that suggested that someone had poured accelerants. According to these experts, the fact that the fire's origins were at the bottom of the structure and the fact that the fire spread so quickly indicated that it was intentional.

The jury unanimously convicted Corona and McDonald on all three counts after four days of trial. It found "that the buildings were being used in interstate commerce or in an activity

4

substantially affecting interstate commerce." The district court denied their motion for dismissal on the grounds that the two buildings did not have the requisite connections to interstate commerce. 934 F. Supp. 740 (E.D. La. 1996). It gave oral reasons for denying their motion to dismiss on double jeopardy grounds. Corona received 41-month concurrent sentences on counts one and two and an additional mandatory 60-month sentence to run consecutively on count three. McDonald received concurrent 33-month sentences on counts one and two and a mandatory consecutive 60-month sentence on count three. Both defendants have appealed.

## II.

Corona and McDonald make an as-applied challenge to their convictions on all three counts by arguing that they exceed Congress's commerce power. According to the defendants, neither of the burned buildings was used in or had a substantial effect on interstate commerce. Because the fire spread to the United Cab warehouse, we do not find this argument persuasive.

In rejecting the defendants' Commerce Clause argument, the district court held that the law permits a jury to find that the government proved that the house on Polymnia Street had the required nexus to interstate commerce. It relied primarily on Russell v. United States, 471 U.S. 858, 105 S. Ct. 2455, 85 L. Ed. 2d 829 (1985), and United States v. Patterson, 792 F.2d 531 (5th Cir.), cert. denied, 479 U.S. 865, 107 S. Ct. 220, 93 L. Ed. 2d 149 (1986), for the proposition that the commerce power extends to the destruction of rental property — including property being prepared

5

for rental — whether or not the rental activity is exclusively intrastate.

We are not confident that Congress possesses such broad powers. The defendant in Russell attempted to burn down a two-unit apartment building and was convicted under § 844(i). The Court upheld the conviction because the rental of real estate is part of commerce. It did not require a showing of a specific connection to interstate commerce because "Congress intended to exercise its full power to protect 'business property'" and can protect property involved in exclusively intrastate business as part of its regulation of the interstate rental market. Russell, 471 U.S. at 860-61, 105 S. Ct. at 2456-57. In contrast to the property in Russell, the Polymnia Street house was neither rented nor on the rental market. It is not clear that Corona ever could have realized his aspirations of creating a youth hostel or a block of apartments. The property was hardly different from a private home, which the Russell Court cautioned may not have been within Congress's intent in passing § 844(i). Id. at 862, 105 S. Ct. at 2457.

Patterson involved a fire that destroyed twelve units at a 78-unit condominium complex that was under construction. We upheld the conviction under § 844(i) in spite of the fact that none of the units were yet for sale. But we noted that the interstate commerce requirement was satisfied because the builder's "activity was a significant business venture involving out-of-state partners and financing by an out-of-state lender." Patterson, 792 F.2d at 536.

Again, the Polymnia Street property bears little resemblance to the partially-completed condominium complex in Patterson. There has been no mention of out-of-state financiers or prospective tenants. The sheer size of the Patterson project made its likely effect on interstate commerce obvious both for investors and for potential purchasers. The commercial dimensions of Corona's project were modest at best, and the interstate component of his commercial plans was trifling.

Furthermore, the analysis in Patterson lost some of its vitality when the Supreme Court announced that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." United States v. Lopez, ___ U.S. ___, ___, 115 S. Ct. 1624, 1630 (1995). In Lopez, the Court struck down the Gun-Free School Zones Act, 18 U.S.C. § 922(q), which criminalized the possession of a firearm within a school zone. By inserting the word "substantially" in its formulation of the "effects test," the Court reminded us that federal courts have a duty to scrutinize the Congress's commerce power and dispelled the notion that de minimis connections to interstate commerce can legitimate federal legislative powers. See United States v. Pappadopoulos, 64 F.3d 522, 527 (9th Cir. 1995) (explaining that Lopez has heightened § 844(i)'s jurisdictional requirement to a "'substantial' effect on or connection to interstate commerce"). The Lopez Court also emphasized that federal criminal laws can easily intrude on the "traditional concern[s] of the States." ___ U.S. at ___, 115 S. Ct. at 1640

7

(Kennedy, J., concurring).  Like the statute in <u>Lopez</u>, § 844(i) imposes a criminal penalty in an area that has been the domain of state jurisprudence throughout our history.  The consequences of arson are typically local, and we have traditionally left it to the states to determine the appropriate penalty, just as we have traditionally left educational policy to localities, which "may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear."  <u>Id.</u> at ___, 115 S. Ct. at 1641 (Kennedy, J., concurring).  The jurisdictional element in § 844(i) protects it from the facial challenge at issue in <u>Lopez</u>.  <u>See</u> <u>United States v. DiSanto</u>, 86 F.3d 1238, 1245 (1st Cir. 1996) ("[W]hatever <u>López</u>' reach, it certainly did not purport to overrule cases upholding application of the Commerce Clause power to wholly intrastate activities satisfying the requisite nexus to interstate commerce."), <u>petition for cert. filed</u>, 65 U.S.L.W. 3531 (U.S. Nov. 12, 1996).  Nevertheless, the limits of the commerce power are sharper in the wake of <u>Lopez</u> than they were when we decided <u>Patterson</u>.  Indeed, <u>Lopez</u> calls into question a family of cases interpreting § 844(i).[1]

---

[1] <u>See, e.g.</u>, <u>United States v. Utter</u>, 97 F.3d 509, 516 (11th Cir. 1996) (finding federal jurisdiction under § 844(i) because "the restaurant served alcohol and used natural gas, both of which originated outside of Florida"); <u>United States v. Ryan</u>, 41 F.3d 361, 365 (8th Cir. 1994) (en banc) ("The short duration of the closure, receipt of utility services for much of the month and continued receipt of natural gas, Ryan's continued presence on his father's payroll as manager of the Fitness Center . . . , and the [out-of-state] lease arrangement itself all lead to the conclusion that the Fitness Center was an instrumentality of interstate commerce for purposes of satisfying the requirements of section 844(i)."), <u>cert. denied</u>, ___ U.S. ___, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995); <u>United States v. Ramey</u>, 24 F.3d 602, 607 (4th Cir.

The Seventh Circuit has recently reaffirmed the view that the Commerce Clause allows application of § 844(i) to the burning of private homes connected to natural gas lines because "the sum of many small effects can be a large effect." United States v. Hicks, ___ F.3d ___, ___, 1997 WL 39856, at *2 (7th Cir. 1997). Without challenging the general thrust of the aggregation principle, we doubt that an effect as small as the cessation of natural gas service to a single household satisfies the constitutional requirement. Taking the "effects test" to its logical extreme

_____

1994) (holding that the destruction of a mobile home affected interstate commerce because it received electricity from an interstate power grid), cert. denied, ___ U.S. ___, 115 S. Ct. 1838, 131 L. Ed. 2d 757 (1995); United States v. Shively, 927 F.2d 804, 808 (5th Cir.) (allowing a § 844(i) conviction where there is "[e]ven a de minimis effect on interstate commerce"), cert. denied, 501 U.S. 1209, 111 S. Ct. 2806, 115 L. Ed. 2d 979 (1991); United States v. Stillwell, 900 F.2d 1104, 1111-12 (7th Cir.) (holding that § 844(i) covered the destruction of a private residence because "the aggregate class of . . . all arson of private homes supplied with interstate natural gas[] has more than a de minimis effect on interstate commerce"), cert. denied, 498 U.S. 838, 111 S. Ct. 111, 112 L. Ed. 2d 81 (1990); United States v. Andrini, 685 F.2d 1094, 1096 (9th Cir. 1982) ("[T]he construction of a commercial office building using out-of-state materials is a commercial activity affecting interstate commerce for the purposes of § 844(i)."). Cf. United States v. McMasters, 90 F.3d 1394, 1399 (8th Cir. 1996) (explaining that Lopez did not overrule sub silentio Russell's principle that "renting a house is the sort of economic activity that might, through repetition elsewhere, substantially affect interstate commerce"), cert. denied, ___ U.S. ___, 117 S. Ct. 718, 136 L. Ed. 2d 636; ___ U.S. ___, 117 S. Ct. 783, ___ L. Ed. 2d ___ (1997); United States v. Martin, 63 F.3d 1422, 1427 (7th Cir. 1995) (holding that even after Lopez, the Commerce Clause permits a conviction under § 844(i) where the burned building was "a rental property still available for rent but otherwise closed to interstate commerce"); Reedy v. United States, 934 F. Supp. 184, 187 (W.D. Va. 1996) ("Reedy's placement of the restaurant building, zoned for commercial use, on the real estate market and the subsequent contacts with potential buyers from another state who were seeking to start a commercial venture satisfied the government's burden . . . under § 844(i)."), dismissed on other grounds, 105 F.3d 649 (4th Cir. 1997) (mem.).

9

would for all practical purposes grant the federal government a general police power, the very danger the Lopez Court warned us against. See Lopez, 115 S. Ct. at 1632. The aggregate effect of arsons of private homes may have a substantial effect on interstate commerce. But if each arson in the aggregation is negligible, the calculation of their effect becomes speculative in the same way that the effect of gun possession near schools is speculative. We are reluctant to tolerate so much speculation. If these convictions were based only on the house on Polymnia Street, then, Corona's and McDonald's actions might not have a strong enough connection to interstate commerce to warrant the exercise of Congress's commerce power.

Fortunately, we can put off that question for another day. We find that these convictions comport with the Commerce Clause because of the fact that the fire spread to the United Cab warehouse on Carondelet Street. Not only was the Carondelet Street property actually being rented, but it was serving a commercial rather than a residential purpose. Indeed, the government elicited testimony that the building facilitated a business that regularly offered transportation services to interstate travelers arriving at New Orleans International Airport. See Katzenbach v. McClung, 379 U.S. 294, 304 (1964) (holding that Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, is within Congress's commerce power as applied to a restaurant that serves interstate travelers). Whatever effect Lopez may have had on the rule announced in Russell, we do not think that it went so far as to eliminate from

10

the scope of § 844(i) buildings rented to businesses that provide transportation to a significant number of out-of-state visitors. Because of its interest in promoting mobility throughout the nation, the federal government has an interest in protecting local commercial transportation offered to the general public. Consequently, it may criminalize the burning of buildings rented by cab companies for commercial purposes because those burnings can have a substantial effect on interstate commerce.[2]

Corona and McDonald argue that because they did not intend to burn the warehouse rented by United Cab, they did not "maliciously damage[] or destroy[]" that building within the meaning of § 844(i). We disagree. In <u>United States v. Gullett</u>, 75 F.3d 941 (4th Cir.), <u>cert. denied</u>, ___ U.S. ___, 117 S. Ct. 134, 136 L. Ed. 2d 83 (1996), a defendant intended to kill a business associate by arranging for him to set off an explosive package in his home. The victim instead triggered the explosion outside of property rented by the business. The government won an arson conviction even though the defendant did not intend to harm the building. Affirming the conviction, the Fourth Circuit held that § 844(i) uses the word "maliciously" in the same way that common-law courts

---

[2]As the Court indicated in <u>United States v. Robertson</u>, 115 S. Ct. 1732, 1733 (1995) (per curiam), the three Commerce Clause tests utilized in <u>Lopez</u> are analytically distinct. Because we decide this case under <u>Lopez</u>'s "substantial effects" test, we need not decide whether these convictions would survive scrutiny under the test involving "the use of the channels of interstate commerce" or the test involving "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." <u>See</u> <u>Lopez</u>, 115 S. Ct. at 1629.

used it: acting "intentionally or with willful disregard of the likelihood that damage or injury would result." Id. at 947. We agree with the Fourth Circuit that the statute's definition of "maliciously" includes "wanton and willful burnings without justification or excuse," just as the common law's understanding of arson did. See John W. Poulos, The Metamorphosis of the Law of Arson, 51 MO. L. REV. 295, 405 (1986). See also McFadden v. United States, 814 F.2d 144, 146 (3d Cir. 1987) (holding that Congress intended § 844(f)'s prohibition on "maliciously" using fire to damage or destroy government property to extend to acts in willful disregard of the likelihood of damage). Corona and McDonald could not have helped knowing that the Carondelet Street property was only a few feet from the Polymnia Street house. We have no trouble concluding that they acted in willful disregard of the likelihood of spreading the fire to the warehouse.

III.

A.

Corona and McDonald argue that their conviction on count three violates their Fifth Amendment rights because it amounts to a second, unauthorized punishment for the crimes referred to in counts one and two. We agree. We hold that, with the possible exception of cases in which conspirators use fire as a means of communication, Congress has not authorized three separate punishments for arson, for conspiracy to commit arson, and for using fire to commit conspiracy to commit arson.

12

Although both defendants' sentences on counts one and two are concurrent, each of the three sentences carries its own $50 special assessment under U.S.S.G. § 5E1.3. As long as a sentence carries a mandatory special assessment, it is a separate punishment for double jeopardy purposes. United States v. Kimbrough, 69 F.3d 723, 729 (5th Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 1547, 134 L. Ed. 2d 650 (1996). Because of the special assessments, then, Corona and McDonald were each punished three separate times, once under each statute.

The government argues that the defendants cannot take advantage of this doctrine because they did not object to the special assessments at sentencing. But the defense did not need to make such an objection to preserve the double jeopardy argument; it could consistently maintain that multiple punishments should not be allowed and concede that if multiple punishments are permissible, the mandatory assessments apply. Preserving the double jeopardy theory required the defense simply to put the district court on notice of the nature of its objection. Wallace v. Ener, 521 F.2d 215, 218 (5th Cir. 1975). Furthermore, in contrast to a complaint about multiplicity in an indictment, "[a] complaint about multiplicity of sentences . . . can be raised for the first time on appeal." United States v. Stovall, 825 F.2d 817, 821 (5th Cir.), amended, 833 F.2d 526 (5th Cir. 1987).

When multiple punishments are at issue, our inquiry focuses on whether Congress intended for the defendant's actions to be subject to the punishment received. If statutory language authorizes the

13

punishment, there can be no double jeopardy violation.  <u>Missouri v. Hunter</u>, 459 U.S. 359, 368-69, 103 S. Ct. 673, 679 (1983); <u>Albernaz v. United States</u>, 450 U.S. 333, 336, 101 S. Ct. 1137, 1141 (1981).  But if that inquiry is inconclusive, we apply the interpretive tool announced in <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which asks "whether conviction under each statutory provision requires proof of an additional fact which the other does not."  <u>United States v. Nguyen</u>, 28 F.3d 477, 482 (5th Cir. 1994) (citing <u>United States v. Free</u>, 574 F.2d 1221, 1224 (5th Cir.), <u>cert. denied</u>, 439 U.S. 873, 99 S. Ct. 209, 58 L. Ed. 2d 187 (1978)).  Where there are more than two statutory provisions at issue, each offense must contain an element not contained in the sum of the elements of the other offenses.  <u>See</u> <u>United States v. Davis</u>, 793 F.2d 246, 248 (10th Cir.), <u>cert. denied</u>, 479 U.S. 931, 107 S. Ct. 400, 93 L. Ed. 2d 353 (1986).  Determining whether statutory offenses are separate for double jeopardy purposes involves parsing the statutes apart from the facts of any particular case.  <u>United States v. Singleton</u>, 16 F.3d 1419, 1422 (5th Cir. 1994).

The prosecution framed these indictments carefully in order to avoid a more obvious double jeopardy violation.  If the predicate offense in the use-of-fire count had been the arson charged in count two, those two counts would differ only in name — both would punish the defendants for burning buildings with an effect on interstate commerce.  The Seventh Circuit has sensibly held that convictions under § 844(h)(1) and § 844(i) create a double jeopardy

14

violation when the § 844(i) offense is the crime in which the defendant used fire.  United States v. Chaney, 559 F.2d 1094, 1095-96 (7th Cir. 1977).  Neither crime involves an element that the other does not.  Just as one necessarily uses force in committing robbery, one necessarily uses fire in committing arson.  With no indication from Congress that every arson should be subject to the five-year[3] enhancement set out in § 844(h)(1), the Seventh Circuit concluded that these counts amount to "'the same offense' within the meaning of the double jeopardy clause because they would be proved by identical evidence."  Id. at 1096 (citing Brown v. Ohio, 432 U.S. 161, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)).  The government admits on appeal that Chaney's analysis would control if arson had been the predicate of the use-of-fire charge: "The Court in Nguyen[, 28 F.3d at 485,] indicated that Congress intended multiple, consecutive punishments for subsections (h) and (i) of Section 844, as long as the predicate felony for subsection (h) is not the subsection (i) charge itself" (emphasis added).  Cf. United States v. Fiore, 821 F.2d 127, 130-31 (2d Cir. 1987) (distinguishing Chaney where mail fraud is the underlying felony in a use-of-fire conviction).

The only way for the prosecution to evade the sort of violation found in Chaney was to make count one rather than count two into the predicate underlying the use-of-fire charge.  Instead

---

[3]In 1996, Congress increased the enhancement for first-time offenders to ten years.  Antiterrorism and Effective Death Penalty Act of 1996, § 708(a)(3)(A), Pub. L. No. 104-132, 110 Stat. 1214, 1296.

of using fire to commit arson, then, the prosecution alleged that Corona and McDonald used fire to commit conspiracy to commit arson.

We have seen this tactic before. The prosecution in United States v. Riggio, 70 F.3d 336 (5th Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 1366, 134 L. Ed. 2d 531 (1996), charged a defendant with these same three statutory violations after he consummated his agreement to burn an automobile dealership for $5,000. Applying the Blockburger test, we held that "conspiracy to commit arson may serve as the predicate felony for a use of fire charge." But the jury in Riggio acquitted the defendant of the § 844(i) arson charge. Indeed, we noted that Chaney did not apply because "[t]he instant case is different from the situation in which the defendant is convicted of arson and the use of fire charge." Id. at 338 n.10. In the case of Corona and McDonald, by contrast, the prosecution won convictions on all three counts. Our question is whether the prosecution's sleight of hand reflects a use of § 844(h)(1) that comports with the punishment that Congress intended for defendants such as Corona and McDonald.

B.

Because the penalty for using fire functions as a statutory enhancement, the conspiracy count and the arson count do not need to include an element not included in the use-of-fire count. See, e.g., Smallwood v. Johnson, 73 F.3d 1343, 1350 & n.9 (5th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 212, 136 L. Ed. 2d 146 (1996); Singleton, 16 F.3d at 1425. But the defendants insist that the use-of-fire count violates Blockburger because it required the

16

jury to find nothing beyond the combined elements of the conspiracy and arson counts. The government's theory at trial was that Corona and McDonald used fire to commit conspiracy when they started the fire as an overt act in furtherance of the arson conspiracy. The indictment specifically listed starting the fire as one of the overt acts supporting the § 371 charge. The government points out that combining § 844(h)(1) with a conspiracy charge has been sanctioned not only by Riggio, but also by the Seventh Circuit in United States v. Hayward, 6 F.3d 1241, 1246-48 (7th Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1369, 128 L. Ed. 2d 46 (1994), which upheld a conviction for using fire in the commission of an illegal conspiracy to intimidate on the basis of race by burning crosses.

If setting the buildings on fire was the only way that Corona and McDonald could have used fire to commit their conspiracy, their punishment was unconstitutionally duplicative. The conspiracy and the arson counts required the jury to find that the defendants agreed to commit an act in reckless disregard of the danger of burning a building affecting interstate commerce, that they acted in furtherance of that agreement, and that their reckless or intentional actions actually caused the burning of a building affecting interstate commerce. On the fire-as-overt-act theory, nothing more need be proved in order to find a violation of § 844(h)(1). Once the jury has found the defendants guilty of arson and conspiracy to commit arson, it has found them guilty of using

fire as part of that conspiracy.  That violates <u>Blockburger</u>, and we presume that Congress did not intend such a result.

Another theory of how the defendants used fire is available, one that does not depend on equating the fire with an overt act.  In the abstract, the charge of using fire to commit conspiracy to commit arson could be separate from the conspiracy itself if the jury were required to find that fire had some role in facilitating the conspirators' agreement.  The jury in this case, for example, could conceivably have found that Corona and McDonald communicated across the Mississippi River by smoke signals or by hanging a lantern in a belfry.  We do not reach the question of whether that kind of conduct would merit punishment under § 844(h)(1).  But the government would have a colorable argument to that effect.  <u>Compare</u> <u>Hayward</u>, 6 F.3d at 1246-48 (allowing a § 844(h)(1) conviction even where the fire's purpose is not to destroy property), <u>with</u> <u>United States v. Lee</u>, 935 F.2d 952 (8th Cir. 1991) (concluding that § 844(h)(1) does not apply to non-destructive fires), <u>reh'g en banc granted on other grounds</u>, 6 F.3d 1297 (8th Cir. 1993) (en banc), <u>cert. denied</u>, ___ U.S. ___, 114 S. Ct. 1550, 128 L. Ed. 2d 199 (1994).  In the most technical sense, then, the three convictions survive the <u>Blockburger</u> test.

The <u>Riggio</u> court did not consider whether one "uses fire" to commit conspiracy when one uses fire to commit an overt act in furtherance of the conspiracy.  And the <u>Hayward</u> court noted that the defendants had waived the argument that "[t]he fire was not an aid in formulating the agreement" because "the federal felony of

18

conspiracy . . . is complete at the time that the agreement is made." Hayward, 6 F.3d at 1248 n.9. The same is true in this case. Because the defendants have not argued the point, we do not question the government's premise that § 844(h)(1) permits the fire-as-overt-act theory.

But even if § 844(h)(1) requires fire to be used as more than an overt act, we would not allow these sentences to stand. Although it is possible to speculate that Corona and McDonald used fire to communicate, there is no evidence that anything of the sort happened in this case. On these facts, it would be inappropriate to burden the defendants with the full force of Blockburger's abstractions. The government did not contend at trial that the defendants used fire to agree, and it does not advance anything like a smoke-signal theory on appeal. The Supreme Court has recognized that "[t]here may be instances in which Congress has not intended cumulative punishments . . . , notwithstanding the fact that each offense requires proof of an element that the other does not." Whalen v. United States, 445 U.S. 684, 693 n.7, 100 S. Ct. 1432, 1438 n.7, 63 L. Ed. 2d 715 (1980). And in the past we have declined to indulge in speculations with no support in the record in order to get a conviction past the Double Jeopardy Clause. In United States v. Evans, 854 F.2d 56, 57 n.2 (5th Cir. 1988), for example, we held that two § 922(a)(6) counts for giving false information in connection with the purchase of a firearm or ammunition were duplicative in spite of the fact that "[i]t is . . . theoretically possible that on each occasion Evans twice

19

separately furnished the Robinett driver's license." We noted that neither the indictment nor the jury instructions required such a finding and that the government never contended at trial that there were separate false statements for each count. Id. See also United States v. Hodges, 628 F.2d 350, 352 (5th Cir. 1980) (concluding "that appellant illegally received two sentences for the proof of one crime" because the government did not argue at trial that the defendant possessed the relevant firearms at different times or places); United States v. Hernandez, 591 F.2d 1019, 1022 (5th Cir. 1979) (en banc) (finding a double jeopardy violation where the government used the same evidence to prove both distribution and possession with intent to distribute under 18 U.S.C. § 841(a)(1)). Evans, Hodges, and Hernandez, unlike this case, concerned multiple punishments under a single statute. See Gore v. United States, 357 U.S. 386, 391, 78 S. Ct. 1280, 1284, 2 L. Ed. 2d 1405, 1409 (1958) (distinguishing single- from multiple-statute cases). Nevertheless, they spring from a concern that the prosecution's creative pleading can lead to unauthorized multiple punishment. Without any hint from the government that Corona and McDonald used fire as a medium of communication, we will not allow that theory to serve as a basis for the government's contention that these § 844(h)(1) convictions comport with Congress's intended application of the statute.

### C.

When we find duplicative sentences, we vacate the offending sentences and remand with instructions that the government may

20

elect which counts to dismiss in order to bring the sentences into compliance. United States v. Brechtel, 997 F.2d 1108, 1112 (5th Cir.), cert. denied, 510 U.S. 1013, 114 S. Ct. 605, 126 L. Ed. 2d 570 (1993); United States v. Goff, 847 F.2d 149, 172 (5th Cir.), cert. denied, 488 U.S. 932, 109 S. Ct. 324, 102 L. Ed. 2d 341 (1998). In this case, the government may choose to dismiss any of the three counts. Under Riqqio, multiple punishments under § 844(h)(1) and § 371 can stand, even if the conspiracy is the predicate for the § 844(h)(1) count. Multiple punishments under § 844(i) and § 371 can stand because both the conspiracy count and its predicate offense require an element that the other does not. See United States v. Felix, 503 U.S. 378, 389, 112 S. Ct. 1377, 1384, 118 L. Ed. 2d 25 (1992). As far as the double-jeopardy analysis is concerned, the government can even choose to pursue multiple punishments under § 844(i) and § 844(h)(1). Unlike the charges in Chaney, the predicate offense for the § 844(h)(1) count is not arson as such, but conspiracy to commit arson. Thus, § 844(h)(1) requires — and the jury found — an element not contained in § 844(i): an agreement.

IV.

Corona and McDonald were each represented by different counsel at trial. Although Corona was and is represented by a federal public defender, he managed to hire private counsel to represent McDonald and Stock, the at-large defendant. McDonald's trial counsel withdrew after filing a notice of appeal, and McDonald obtained a new attorney. On the strength of Cuyler v. Sullivan,

21

446 U.S. 335, 349-50, 100 S. Ct. 1708, 1719, 64 L. Ed. 2d 333 (1980), he contends before us that the fact that his trial counsel was being paid by Corona created an actual conflict of interest that requires us to grant him a new trial. Specifically, McDonald explains that his trial counsel asked McDonald on the stand about Corona's behavior after the fire in a way that suggested that Corona was not privy to the plot. He also suggests that his counsel's decision to have McDonald testify was motivated by his interest in decreasing the chances that Corona would be convicted.

McDonald inaccurately describes his trial counsel's situation as "multiple representation." Unlike the defense counsel in Cuyler, who had professional duties to three co-defendants, McDonald's attorney had an obligation to pursue only McDonald's interests at trial. V.J. Stock was not present, and McDonald does not suggest that the concurrent duties to McDonald and Stock created any actual conflict. The fact that Corona paid McDonald's counsel does not mean that he represented Corona. See Model Rules of Professional Conduct Rule 1.8(f) (allowing lawyers to accept compensation from third parties).

In some circumstances, we have required trial judges to hold Garcia hearings when they know of an actual conflict of interest. See, e.g., United States v. Greig, 967 F.2d 1018, 1022 (5th Cir. 1992) (remanding for a Garcia hearing where defense counsel committed serious ethical breaches that put him "in the position of simultaneously having to defend himself as well as his client regarding their potentially criminal activity"). We afford this

22

protection to criminal defendants to ensure that they have made an informed waiver of the right to conflict-free counsel. See United States v. Garcia, 517 F.2d 272 (5th Cir. 1975).

We cannot find any reason why the district court should have been alerted to any conflict of interest here. McDonald's direct examination was hardly calculated to exonerate Corona. And the fact that McDonald testified on his own behalf was not sufficient to put the court on notice that something might be amiss. McDonald's testimony disclosed that his counsel received payment from Corona, but that by itself does not establish a conflict of interest. As far as the court was concerned, McDonald could have declined Corona's assistance and accepted appointed counsel if he thought his counsel would be disloyal.

In essence, then, McDonald is simply arguing that he received ineffective assistance of counsel. But he did not make this argument at trial. "[A] claim of ineffective assistance of counsel cannot be resolved on direct appeal unless it has been first raised before the district court." United States v. Bounds, 943 F.2d 541, 543-44 (5th Cir. 1991). As in Bounds, McDonald can press his ineffective-assistance claim under 28 U.S.C. § 2255.

V.

Finally, McDonald challenges the sufficiency of the evidence on all three counts. Criminal convictions are supported by sufficient evidence "if a reasonable trier of fact could conclude that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable

23

to the jury's verdict and drawing all reasonable inferences from the evidence to support the verdict." United States v. Mmahat, ___ F.3d ___, ___, 1997 WL 52191, at *8 (5th Cir. 1997).

The government's evidence that the fire was caused by an arsonist was overwhelming: a parade of experts explained their various reasons for concluding that someone had burned the Polymnia Street house intentionally.  An eyewitness placed McDonald at the scene within a minute of the fire.  Suzanne Guidroz testified that she had seen McDonald on several occasions before and had a chance to confirm his identity when he walked to the United Cab building to place a telephone call.  Investigators testified that he showed up the next morning at the property.  McDonald admits that he lied to these investigators when they asked him about the blaze.  See United States v. Meyer, 733 F.2d 362, 363 (5th Cir. 1984) ("False exculpatory statements may be used . . . as substantive evidence tending to prove guilt.").  According to Ms. Guidroz, McDonald and Stock were acting in concert to prepare the house for the fire.  Based on this evidence, a reasonable jury could conclude that, beyond a reasonable doubt, McDonald agreed to burn down the Polymnia Street house and carried out that agreement.  See United States v. Ruiz, ___ F.3d ___, ___, 1997 WL 49333, at *5-*8 (1st Cir. 1997) (upholding arson and conspiracy convictions on circumstantial evidence, including the likelihood that the defendants were lying); United States v. Utter, 97 F.3d 509, 512 (11th Cir. 1996) (finding the evidence of arson sufficient where the evidence showed that the fire was intentional, that the

24

defendant had a motive, and that the defendant had talked about setting the property on fire).

VI.

Corona's and McDonald's convictions comport with the Commerce Clause and are supported by sufficient evidence. Their sentences, however, violate the Double Jeopardy Clause. We vacate the sentences on all three counts and remand this case to the district court so that the government can dismiss one of the counts and the court can impose new sentences. McDonald's claim of ineffective assistance of counsel is dismissed without prejudice.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.

25