In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-3320

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DYTANIEL L. MCBRIDE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:10-cr-10124-JES-JAG-1—**James E. Shadid**, *Chief Judge*.

ARGUED MAY 21, 2013—DECIDED JULY 26, 2013

Before POSNER, MANION, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant was convicted in a bench trial of drug offenses, conspiracy to launder money (18 U.S.C. § 1956(h)), and arson (18 U.S.C. § 844(i)), and was sentenced to life for the drug offenses and 20 years (to be served concurrently) for each of the other two offenses. He challenges the convictions for conspiracy and arson, but we'll begin with the sentence, which both parties question in a confusingly captioned

"Joint Motion for Remand to Vacate Sentence and Remand for Resentencing."

When there are multiple offenses, the judge bases his calculation of the defendant's guidelines sentencing range on the offense that has the highest offense level. The judge determined that to be the money-laundering offense, for which he determined the defendant's offense level to be 43. Here's how he got to that number: The offense level for money laundering (or, as in this case, conspiracy to launder money) is the offense level for the crime from which the laundered money was derived, plus adjustments including the addition of two levels for the laundering itself. U.S.S.G. §§ 2S1.1(a)(1), b(2)(B). But the judge mistakenly added four levels for the laundering instead of two. Had he added two instead, and avoided a further mistake pointed out below, he would have correctly determined the defendant's offense level for conspiring to launder money to be 42.

To explain, the base offense level for the defendant's drug crime was 36, raised to 38 by the addition of two levels for his having played a leadership role in the crime (U.S.S.G. § 3B1.1(c)); and (if properly computed) to 40 by the addition of two levels for the laundering conviction under 18 U.S.C. § 1956; and to 42 by reason of the adjustment for multiple counts of conviction that is required by § 3D1.4—not to 43. (The reason the final offense level calculated by the judge was 43 rather than 44, which should have been the level produced by his erroneous addition of four rather than two levels for

the laundering conviction, was that he made an additional error in the multiple-count adjustment, this time in the defendant's favor, by adding only one level rather than two levels for the defendant's multiple counts of conviction.)

The difference between level 42 and level 43 is significant. Level 43 is life, period—a point, not a range. Level 42 is 360 months to life. U.S.S.G., ch. 5, pt. A, Sentencing Table.

Confusion enters because the parties have packaged the government's confession of error as a joint motion to remand the case for resentencing. The motion was premature. The defendant's final offense level would have been only 38 had it not been for his convictions for conspiracy to launder money and for arson. It was those convictions that were responsible for the additional offense levels (both directly and by requiring a multiple-counts adjustment) to what would otherwise have been a level 38—the base offense level for the drug crime plus the two additional levels for the defendant's leadership role in that crime. His appeal challenges those other two convictions (but not his drug conviction). It would be nonsensical to remand for resentencing on the assumption that the defendant's offense level should be corrected to 42 when if the defendant prevails in his current appeal the offense level will be only 38 (or 40, if he knocks out only one of the additional convictions, that is, either laundering or arson).

So since a remand for resentencing is premature (or at least was when the joint motion was filed), we'll ignore

the motion's caption and treat the motion as a simple confession of error by the government.

And now to the merits of the appeal, beginning with the conviction for conspiracy to launder money. The defendant owned and operated a clothing store, which he called Tha Place, in Peoria, Illinois. The store was the front for his drug dealings. His girlfriend, Deshawn Boyett, worked intermittently at the store. She knew that the defendant had been dealing drugs and was continuing to do so—she even delivered some of the drugs to his customers. The money-laundering conspiracy involved more than $270,000 in cash deposits, ranging from $25,000 to $50,000, that Boyett made to Tha Place's account in a Chicago bank between February and April of 2009—a period in which she was doing Tha Place's bookkeeping and knew that the store did not generate revenue on that scale. She testified at the defendant's trial that she thought the amount of the deposits "odd" in light of the store's modest revenues. But she didn't acknowledge knowing that the deposits were actually of drug money; and if she didn't know that, the defendant argues, she was not his co-conspirator, and if this is right then as no other person is alleged to have conspired with him to launder money the conspiracy charge fails.

The defendant is correct that for him to be guilty of conspiracy requires that at least one other person have agreed with him to commit an illegal act. *Smith v. United States*, 133 S. Ct. 714, 719 (2013). Several of our cases, it is true, beginning with *United States v. Gracia*, 272 F.3d 866,

873 (7th Cir. 2001), say that a conviction for participating in a conspiracy to launder money requires proof that the defendant was "knowingly involved with two or more people for the purpose of money laundering," implying that the minimum number of participants in a conspiracy is three. See also, e.g., *United States v. Arthur*, 582 F.3d 713, 718 (7th Cir. 2009). We have found a similar statement in a case from another circuit: *United States v. Alerre*, 430 F.3d 681, 694 (4th Cir. 2005). If the "two or more" proposition is sound, our defendant is entitled to be acquitted of conspiracy to launder money. It's unsound. Nothing in the conspiracy provision of the money-laundering statute, 18 U.S.C. § 1956(h), or in conspiracy law generally, requires that a conspiracy have more than two participants. In both *Gracia* and *Alerre* the court seems simply to have been repeating the charge against the defendant, which happened to be of a conspiracy with more than two participants, rather than redefining conspiracy. Likewise the cases that cite *Gracia* evince no intention of changing settled law. In *United States v. Emerson*, 128 F.3d 557, 561 (7th Cir. 1997), we correctly stated that "a conspiracy involves a combination of two or more people formed for the purpose of carrying out some criminal act"—and the conspiracy in that case was a conspiracy to launder money, just as in this case.

The requirement that all conspirators agree to commit the illegal act that is the conspiracy's object might be questioned in this case on the ground that it would have made no difference to the scope, consequences, or detectability of the defendant's drug dealing and money

laundering had Boyett been innocently unaware that the money she deposited in the Chicago bank was proceeds of drug dealing rather than revenue from the sale of clothing. But to deem every unwitting helper of a criminal a co-conspirator would turn virtually every crime into a conspiracy. It would mean that a store-owner who sold rat poison to a customer with no inkling of suspicion that the customer intended to use it to kill a neighbor's cockatoo was a member of a conspiracy, and the customer (if he carried out his wicked scheme) guilty not merely of destroying another person's property but also of conspiracy to destroy another person's property.

But the trier of fact (the judge) in this case could and did find beyond a reasonable doubt that Boyett must have known that she was laundering proceeds of crime. She knew the defendant was a drug dealer, knew that most of the money she was depositing didn't come from the sale of clothing, and either knew that the money could have come only from his drug dealings or suspected as much yet feared that inquiring of the defendant would confirm her suspicion—a form of willful blindness that the law equates to knowledge. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011); *United States v. Santos*, 553 U.S. 507, 521 (2008) (plurality opinion). (You know, but you want to preserve deniability by avoiding the final proof.) What made Boyett a co-conspirator of the defendant was not that she knew he was a money launderer, however, but that knowing it she assisted him in his money laundering by depositing drug money in the Chicago bank representing it to be the proceeds of sales of clothing. And

she was in fact prosecuted for conspiracy to launder the money, though separately from our defendant, and pleaded guilty.

So we come to the arson conviction. The evidence concerning the alleged arson is remarkably sparse. We do know from the trial record that the defendant set fire to Tha Place; that according to him he did so because he was "tired" of running it; and that to do the burning he had soaked some towels in gasoline, pressed the towels against the frame of a window at the front of the store, lit them, and left. It was 2 a.m. when he set the fire and apparently no one was in the vicinity (besides police conducting surveillance, as we'll see) except the defendant and a friend who had agreed in exchange for forgiveness of a debt to help him set the fire but who got cold feet at the last moment and, though present, did not help set it. The trial record is a blank about the size of the store, whether it was free-standing or attached to another building (or perhaps to buildings on either side of it), the extent of the damage caused by the fire, whether the fire department was called, and if it was called whether it responded and if so whether the firemen extinguished the fire. There is some evidence that the store was insured, though no insurance policy was introduced in evidence and there is no indication that the defendant set the fire because he wanted insurance proceeds—or even that he was the policy's beneficiary.

The government's appeal brief filled in none of these gaps. But at the argument its lawyer told us that the record contains photographs of the store plus evidence

that the fire department had been called and had responded and put out the fire and that there had been water damage to property in the store. We were skeptical about these representations because the government's brief not only had omitted them but had suggested that the use of an accelerant (something that accelerates a chemical reaction—the gasoline used in the fire was an accelerant) was arson per se and therefore that nothing else had to be considered.

We directed the government to file a supplemental brief identifying any photographs of the store in the record and any evidence (and if so whether it was in the record) that the fire department had been called and responded. The supplemental brief acknowledges that the record contains no photographs of the store before, during, or after the fire. The brief notes that the Justice Department's files contain police and fire department reports from which it appears that the fire department was called and responded and put out the fire. But those reports are not in the record. Perhaps having second thoughts about the spareness of the government's theory (use of an accelerant as arson per se), the government's lawyer had at the oral argument embroidered her written theory with "evidence" that had not been presented at the defendant's trial and therefore could not be used to support his conviction. We do not suggest that the appellate lawyer, who was not the trial lawyer, was aware that she was going outside the record; but clearly there was a failure of communication within the U.S. Attorney's office.

Neither in its original brief on appeal (or in oral argument), nor in its supplemental brief, did the government mention the considerable evidence in the record that the defendant did not own the building that contained the clothing store—the building that he set fire to. The defendant in his brief implies that he owned it, by arguing, as we'll see, that setting fire to one's own property can't be arson. The government stated in the fact section of its brief that the defendant had leased the building rather than owned it, but did not pursue the issue in the argument section of the brief. We don't know whether this was a tactical decision or an oversight; it doesn't matter which it was.

The federal arson statute punishes, so far as relates to this case, anyone who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire…, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). The defendant unquestionably damaged by means of fire a building that until the day of the fire was being used in an activity affecting interstate commerce—the sale of clothing some of which had been shipped to the store from outside Illinois. So the critical issue is the meaning of "maliciously." The government's brief defines the word to mean intending to cause damage or willfully disregarding the likelihood that damage would result from the defendant's act (setting a fire, in the case of a charge of arson). That's indeed a common definition of the word (or cognates of it, such as "malice"), see, e.g., *United States v. Wiktor*, 146 F.3d

815, 818 (10th Cir. 1998) (per curiam); *United States v. Corona*, 108 F.3d 565, 571 (5th Cir. 1997); *United States v. Gullett*, 75 F.3d 941, 947-48 (4th Cir. 1996), and makes perfectly good sense when the damage involves a harm to a third person, such as libeling or hitting a person. But it makes no sense applied to every occasion on which fire causes damage. If you light a fire in your fireplace, you damage the wood that you burn—destroy it, often—and you inflict the damage, the destruction, intentionally. But you are not acting "maliciously." For the federal arson statute to make sense, "maliciously" has to mean deliberately (or in willful disregard of known or suspected consequences) using fire *to do a harmful act*. See, e.g., *United States v. Corona, supra*, 108 F.3d at 571; *United States v. Gullett, supra*, 75 F.3d at 948. Burning your wood in your fireplace is not a harmful act; it's an innocent act.

An even better example, in view of the government's view that use of an accelerant to start a fire that causes damage is arson per se, is a backyard barbecue grill, in which charcoal is burned and is damaged or destroyed by the burning. Lighter fluid—an accelerant—is commonly used to start the fire in the grill, yet no one thinks that the use of an accelerant to burn charcoal is arson per se.

At the oral argument the government's lawyer conceded the point by acknowledging, in answer to the judges' questions, that if the defendant had had a shed in his yard containing clothing from his store that he thought worthless, he could have burned the shed to

the ground without being guilty of arson, provided he did it in a way that created no obvious dangers. He might be able to do that—that is, burn his shed down without endangering the property or personal safety of other persons—even with gasoline or some other accelerant, depending on the size and contents of the shed, how far it was from any other structure, and whether there were dead leaves or other inflammable material in the vicinity that might catch fire. The concession dooms the government's arson case. The government did not ask the judge to infer that the defendant wasn't the owner of the building, and the judge made no finding about its ownership (or its size, location, or the damage the fire caused)—not that a judge is required in a bench trial in a criminal case to make specific findings of fact unless a party requests him to do so, Fed. R. Crim. P. 23(c); and the judge made none in this case. We can't uphold the defendant's conviction for arson on the basis of a theory that the government disowns and that the defendant in consequence had no incentive to contest.

Going for broke—insisting in effect that it either win big or lose—the government does not deny that the building may have been tiny, remote from any other building, wholly owned by the defendant (or, if not, that the owner had permitted the defendant to burn it down, a possibility implausibly proposed in the defendant's brief), and uninsured, and that it therefore could be burned to the ground without harming anyone (not even an insurance company)—perhaps even without attracting the attention of the fire department. It appears that the

fire was reported—though not even the fact of its being reported is in the record—only because police were maintaining surveillance of Tha Place because they rightly suspected the defendant of being a drug dealer.

For completeness we note however our disagreement with the defendant's two alternative arguments for acquittal of the arson charge. One is that having decided to destroy the store and presumably its contents, he had ceased to engage in interstate commerce or in any activity affecting interstate commerce. The argument would be a winner had the store been converted to a personal residence before the fire. *Jones v. United States*, 529 U.S. 848, 850-51 (2000). But it hadn't been; and a store that obtains inventory from out of state is still being used in an activity that affects interstate commerce when it is closed for the night. *Martin v. United States*, 333 F.3d 819, 821-22 (7th Cir. 2003); *United States v. Tocco*, 135 F.3d 116, 120-21, 124 (2d Cir. 1998).

The defendant's other alternative argument, the argument premised on his owning the building—the premise the government does not challenge—is that burning one's own property is not arson. That was indeed the rule at common law. 3 Wayne R. LaFave, *Substantive Criminal Law* § 21.3, p. 239 (2d ed. 2003). The common law of arson was intended to protect not property as such, but occupants of property. *Id.*, p. 240; John Poulos, "The Metamorphosis of the Law of Arson," 51 *Mo. L. Rev*. 295, 324 (1986). If you owned a building but it was occupied by a tenant, you would be guilty of arson if

you burned it down. 3 LaFave, *supra*, § 21.3(d), p. 248; Poulos, *supra*, at 311. But it is obvious from our quotation of the relevant portion of the federal arson statute that the statute protects unoccupied property, though only against "malicious" damage or destruction by fire. Burning one's own property, even if unoccupied, can be malicious when for example it is a form of insurance fraud or endangers adjacent property or fire department personnel. *United States v. Zendeli*, 180 F.3d 879, 881-82 (7th Cir. 1999); *United States v. Beyer*, 106 F.3d 175, 176, 178 (7th Cir. 1997); *United States v. Corona*, *supra*, 108 F.3d at 567-68, 570-71.

Nevertheless we order the defendant acquitted of the charge of arson for the reason given earlier—the government's decision to stake its case for arson on the untenable position that using gasoline to start a fire that causes damage is arson per se. It should have been an easy case for the government to win. It is evident not only that the defendant set the building on fire but also that it was the site of his clothing store, that the fire almost engulfed his accomplice, that the two men quickly scampered off knowing that the fire would attract the police and firefighters, and that the defendant may have suspected that the police knew he was a drug dealer and destroying the store would have eliminated evidence (the records of the store's meager sales revenues) of his laundering operation. The real case is far from our fireplace and outdoor-grill hypotheticals, but it is the government's gratuitous arson theory that made them relevant. Although the judge made the sentence for arson concurrent with the defendant's other

sentences, the arson acquittal will reduce the multiple-counts adjustment. But the judge can in resentencing take note of the arson as relevant conduct.

To summarize, we remand the case for resentencing in the light both of our order of acquittal and of the government's confession of sentencing error, which we accept, in the calculation of the defendant's guidelines sentencing range. In all other respects we affirm the judgment of the district court.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS.