**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 95-10001**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**GREGORY LYNN MILES, and**
**GERALD JEHORAM GUSTUS,**

**Defendants-Appellants.**

---

Appeal from the United States District Court
for the Northern District of Texas

---

September 5, 1997

Before DeMOSS and DENNIS, Circuit Judges, and DUPLANTIER, District Judge.[*]

PER CURIAM:

In this appeal of their respective criminal convictions, Appellants raise three issues. First, they argue that the district court improperly instructed the jury as to the Hobbs Act; second, they argue that they were improperly subjected to double jeopardy; and, third, they argue that, under the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995), the Hobbs Act is

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

unconstitutional on its face, or as applied in this case, and that the evidence is insufficient to support a finding of "substantial effect" on commerce as they argue is required by *Lopez*. For the following reasons, we affirm the judgments of the district court.


## FACTUAL BACKGROUND

Appellants/Defendants Gregory Lynn Miles and Gerald Jehoram Gustus ("Defendants") were indicted for conspiracy, four counts of interference with interstate commerce by robbery, and four counts of firearm violations for their participation in a series of robberies occurring in Tarrant County, Texas over a two month period. These Tarrant County robberies involved three McDonald's restaurants, a Taco Bueno restaurant, and a Colters's Barbecue and Grill. Gustus alone was indicted for the robbery and firearm violation as to one of the five robberies involved. The following facts were introduced at trial concerning each of the robberies and are not disputed on appeal:

On October 18, 1991, shortly after 7:00 a.m., the Defendants entered a McDonald's Mini-Mac on North Watson Road ("North Watson" store) in Arlington, Texas. At gunpoint, they removed approximately $1,500 from the restaurant's safe. The Defendants were identified at trial as the robbers by the restaurant manager Jenette Johnson and another employee. Johnson also testified that the North Watson store is located near Highway 360, a highway which connects Interstate Highway 20 and Interstate Highway 35. She further testified that the restaurant is located one-half mile from

2

the Six Flags Over Texas amusement park. According to Johnson, the store was closed for approximately one hour following the robbery.

On November 7, 1991, Gustus robbed a second McDonald's located on East Division Street ("East Division" store) in Arlington, Texas. According to the testimony of a McDonald's employee, Esmerelda Graciano, the store was robbed upon its opening at 6:00 a.m. by two men fitting the physical descriptions of the Defendants. Graciano testified that at least one of the assailants had a gun during the robbery. The government introduced into evidence a written confession from Gustus regarding all five of the robberies, including the robbery of the East Division store.[1]

On December 7, 1991, Defendants entered and robbed a third McDonald's restaurant located in Euless, Texas ("Euless" store). The store manager, Regina Woodley, testified that the Defendants, whom she identified at trial, entered the restaurant shortly after it opened at 6:00 a.m. and, at gunpoint, took approximately $3,000. Woodley further testified that the store closed for a period of time following the robbery[2] and that the Euless store is located approximately five minutes from the Dallas/Fort Worth International Airport.

In connection with the three McDonald's robberies, the government introduced the testimony of Richard Matson, the field

---

[1] Defendant Miles was not indicted for this robbery or the firearm violation connected therewith.

[2] Ms. Woodley testified that the store "closed for a while" following the robbery. In response to the question of how long the store was closed because of the robbery, Woodley replied, "I don't recall how long."

purchasing manager for the Dallas and Oklahoma regions of McDonald's. Matson testified that, at the time of the robberies, the North Watson and Euless stores were company-owned stores that purchased many of their ingredients and supplies from out-of-state locations. He also stated that the employee paychecks for the company stores are received from the McDonald's headquarters in Chicago, Illinois, and that the stores send their money and receipts to the Chicago office.

Matson testified that the East Division store was a franchise store at the time of its robbery and that franchise stores obtain their food from the same out-of-state vendors as the company stores. He also testified that the franchise stores send rent payments and service fees to the McDonald's headquarters in Chicago.

On cross-examination, Matson stated that, to his knowledge, the robberies of the three McDonald's restaurants in Tarrant County did not affect the shipment of goods from out of state to the distribution centers in Texas. He further admitted that the employee paychecks, which originated out of state, were not, to his knowledge, disrupted because of the robberies.

On November 22, 1991, Defendants entered a Colter's Barbecue and Grill ("Arlington Colter's") shortly after 7:30 a.m. and removed approximately $1,300 at gunpoint from the restaurant safe. The robbery occurred during a food delivery prior to the restaurant's opening. According to the testimony of the restaurant manager, Susan Brenner, the delivery driver and employees were

4

detained in the restaurant cooler during the robbery. Brenner and another employee identified the Defendants as the perpetrators. Brenner also testified that the restaurant is located in Arlington, Texas, and that it is approximately one-half block from Interstate Highway 20.

Payton Cullum, a regional vice-president of Colter's, testified that, at the time of the robbery, the Arlington Colter's purchased many of its products from out-of-state suppliers in accordance with the company purchasing policy. Cullum also stated that Colter's has catered at least one event out of state (in New York), even though its restaurants are located solely in Texas. He further testified that money received from sales at the Colter's restaurants is used, in part, to purchase food and supplies from out-of-state vendors. Cullum testified that the money taken during the robbery of the Arlington Colter's would have been used for such purchases.

On cross-examination, Cullum stated that the robbery of the Arlington Colter's did not stop the company from purchasing its products from out-of-state suppliers. Further, Cullum admitted that, because the restaurant opened on time, the robbery did not stop travelers on nearby Interstate Highway 20 from being able to eat at the Arlington Colter's.

On November 26, 1991, Defendants entered a Taco Bueno ("Arlington Taco Bueno") at 6:00 a.m. during a food delivery. At gunpoint, the Defendants removed approximately $1,200 from the restaurant's safe. The store manager, Jon Brdecka, identified the

5

Defendants as the robbers. Brdecka also testified that the restaurant was not yet open for business at the time of the robbery. According to Brdecka, he and the delivery driver were detained in the restaurant cooler for a short period of time during the robbery. Brdecka also testified that the restaurant is located on South Cooper in Arlington, Texas, approximately two miles from Interstate Highway 20. He also stated that the Arlington Taco Bueno serves people from out of state, that he has occasionally noticed out-of-state license plates in the parking lot, and that his paycheck is received from out of state.

John Dunion, the vice-president in charge of purchasing for the Black Eyed Pea restaurants, which owns Taco Bueno, testified that Taco Bueno restaurants are located in Texas and Oklahoma and that the restaurants purchase many of their food products from out-of-state vendors. Dunion testified that the Arlington Taco Bueno purchases its food from out-of-state vendors in accordance with the company guidelines. Additionally, he testified that the money from the Arlington Taco Bueno is deposited in a local bank and later wired to a New York bank and held in commercial paper. Dunion stated that money stolen from the Arlington Taco Bueno affected the amount wired from Texas to New York for that deposit. On cross-examination, Dunion testified that the robbery of the Taco Bueno did not change the out-of-state purchasing habits of the company.

**PROCEDURAL BACKGROUND**

The Defendants were first charged in an eleven-count indictment filed on April 7, 1992.[3] At the time of the first federal indictment, Defendants were in the custody of the State of Texas awaiting trial on state charges for other robberies.[4] The federal indictment charged them with conspiracy to interfere with commerce by robbery in violation of 18 U.S.C. § 1951, four counts of interference with commerce by robbery in violation of 18 U.S.C. § 1951, and four counts of using and carrying a firearm during and in relation to the commission of a crime of violence in violation of 18 U.S.C. § 924(c).[5] The Defendants each initially agreed to plead guilty to three of the eleven counts in the indictment in exchange for dismissal of the remaining counts.[6] The plea agreements, however, were subsequently rejected by United States District Judge John McBryde as undermining the statutory purpose of

---

[3]    On July 1, 1992, the government filed a one-count information in addition to the original indictment as to Miles only. The count charged Miles with a felon in possession of a firearm violation (18 U.S.C. § 922(g)) for a separate offense which occurred on November 26, 1991. This information count was later dismissed pursuant to Miles's second plea arrangement.

[4]    *See infra* notes 11-12 (discussing the information available from the record on appeal regarding the Defendants' state convictions.

[5]    Gustus was charged with an additional robbery count and firearm count.

[6]    Miles agreed to plead guilty to the conspiracy to commit robbery count, one firearm violation count, and a charge of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). Gustus agreed to plead guilty to the conspiracy count and two firearm violation counts.

7

sentencing,[7] and the Defendants' case was set for trial. On the day the trial was to begin, the Defendants entered into a second plea agreement in which they each pleaded guilty to four of the eleven counts.[8] This plea agreement was accepted by Judge McBryde and the Defendants were sentenced accordingly.[9] On appeal, this Court reversed and remanded, finding that the district court had improperly participated in the plea negotiations. *See* **United States v. Miles**, 10 F.3d 1135 (5th Cir. 1993).

Upon remand, the case was reassigned to United States District Judge Terry Means who quashed the original indictment without prejudice on May 24, 1994. Judge Means noted that the government failed to allege the requisite effect on interstate commerce, an essential element of a Hobbs Act violation under 18 U.S.C. § 1951.

The Defendants were reindicted on June 14, 1994, by a federal grand jury. At the time of this second indictment, Defendants were serving time in the state prison pursuant to state convictions for robbery and other offenses. Miles's state sentence was fifty

---

[7]     Under the plea agreement, Miles would have been sentenced to approximately 204 months (17 years) and Gustus to approximately 480 months (40 years).

[8]     Miles pleaded guilty to the conspiracy count and three firearm violation counts in exchange for dismissal of the remaining counts against him, including the one-count information added to the indictment. Gustus also pleaded guilty to the conspiracy and three firearm counts in exchange for dismissal of the remaining counts against him.

[9]     Miles was sentenced to a total of 700 months (approximately 58 years) with a three-year term of supervised release on each count. Gustus was sentenced to a total of 750 months (approximately 63 years) with a three-year term of supervised release on each count.

years.[10]  Defendant Gustus's state sentence subjected him to life imprisonment after serving a sentence of fifteen years.[11]

The second federal indictment charged Defendants with the same counts and violations as the original indictment, with the exception that this later indictment included the wording "interstate commerce."[12]  The Defendants pleaded not guilty and were tried by a jury in the court of United States District Judge Eldon

---

[10]  Miles was sentenced to 50 years for his participation in the December 18, 1991, aggravated robbery of a McDonald's in Cooke County, Texas.  Also, when the presentence investigation report was prepared for federal sentencing, Miles was under indictment for aggravated robbery in Rockwall, Texas.  Further, a motion to revoke Miles's 10-year probation sentence, previously received for another aggravated robbery conviction, was pending.

[11]  Gustus was sentenced to 15 years for aggravated robbery and 35 years for aggravated sexual assault in connection with the January 16, 1991, robbery of a Dallas Burger King.  Gustus was also sentenced to 50 years for aggravated robbery and 50 years for aggravated sexual assault in connection with the October 7, 1991 robbery of a second Burger King restaurant in Dallas.  From the record it is unclear if the above convictions were to run concurrently or consecutively.  Gustus was further sentenced to 35 years, to run concurrently with the previous convictions in Dallas, for the December 18, 1991, aggravated robbery of a Cooke County McDonald's.  During the commission of the above mentioned offenses, Gustus was on probation for another aggravated robbery.  Following the above convictions, Gustus's 10-year probation sentence was revoked and he was sentenced to life imprisonment.  His life imprisonment was to run consecutively to his 15-year sentence which he received previously for the January robbery of the Dallas Burger King.

[12]  Defendants were charged with conspiracy to affect *interstate commerce* by robbery (count 1), four counts of affecting *interstate commerce* by robbery (counts 2, 6, 8, and 10) and four counts of knowingly carrying and using a firearm in relation to the commission of a crime of violence (counts 3, 7, 9, and 11).  Gustus was also charged with an additional robbery (count 4) and firearm count (count 5).  All of these counts used the same charging language.  We note that in these counts the government did *not* use the statutory phrase "in any way or degree" in describing the effect on interstate commerce.

Mahon.  During their trial, Defendants timely moved for dismissal of their charges on the grounds that the use of a *de minimis* standard for determining an effect on commerce was unconstitutional and that the government failed to show a substantial effect on interstate commerce as required by the Hobbs Act and the Fifth Circuit's decision in **United States v. Lopez**, 2 F.3d 1342 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995).[13]  Defendants' motions were denied.  The Defendants were convicted on all counts and sentenced as follows:

Miles was sentenced on the federal convictions to a total of 858 months (approximately seventy-two years).  Of the total sentence, seventy-eight months are to run concurrently to the state sentence that Miles is currently serving in Texas, and the remaining 780 months are to run consecutively to the state sentence.  Gustus was sentenced to a total of 1,140 months (approximately ninety-five years).  Of Gustus's total sentence, 120 months are to run concurrently with the state sentences that Gustus is currently serving in Texas, and the remaining 1,020 months are to run consecutively to Gustus's state sentences.

The Defendants filed timely notices of appeal.

## DISCUSSION

---

[13]  The Defendants relied upon the Fifth Circuit's decision in **Lopez** because at the time of the trial, in late 1994, the U.S. Supreme Court's decision affirming the Fifth Circuit's ruling had not yet been handed down.

Miles and Gustus raise three issues on appeal.  We will address each issue in turn.


I.

**_Gaudin Error_**

Miles and Gustus first argue that the district court erred by instructing the jury incorrectly on the elements of a Hobbs Act offense, 18 U.S.C. § 1951.[14]  Holding that Defendants' argument is foreclosed by **_United States v. Parker_**, 104 F.3d 72 (5th Cir. 1996) (en banc), _cert. denied_, 117 S. Ct. 1720 (1997), we find no error.

In relevant part, the district court instructed the jury as follows:

> If you believe beyond a reasonable doubt the government's evidence regarding interstate commerce, to wit, that McDonald's, Colters, and Taco Bueno bought and sold merchandise that had traveled from another state to Texas, or that the robberies affected sales by the stores of such merchandise, or that the money proceeds from these stores moved in interstate commerce, or that these stores served customers who travel in interstate commerce, then you are instructed as a matter of law that there was an effect on interstate commerce....

---

[14]    The Hobbs Act states, in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).

11

Miles and Gustus argue that the district court's instruction impermissibly reserved for itself the question of whether the alleged acts of the Defendants affected interstate commerce. Specifically, Miles and Gustus argue that the district court's instruction does not comport with the Supreme Court's holding in *United States v. Gaudin*, 515 U.S. 506 (1995), which held that the Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged.

Subsequent to the submission of Defendants' briefs, this Court decided *United States v. Parker*, a case which is, as to the form of the jury instruction, virtually indistinguishable from the case at bar. In the *Parker* case, this Court considered, under the Supreme Court's ruling in *Gaudin*, whether the district court had erred by reserving for itself the question of whether Parker's alleged acts affected interstate commerce. In affirming the district court's instruction, we held that "the trial court committed no *Gaudin*-type error." *Parker*, 104 F.3d at 73.

The complaint of Miles and Gustus in the instant case is identical to the complaint of the defendant in *Parker*. Under the doctrine of stare decisis, we are bound to adhere to *Parker*'s earlier holding. *See, e.g., United States v. Arce*, 118 F.3d 335, 338 (5th Cir. 1997). In so doing, we hold that the district court committed no *Gaudin*-type error.

*Double Jeopardy*

Miles and Gustus argue that they were unconstitutionally subjected to double jeopardy when they were tried and convicted under both the Hobbs Act and 18 U.S.C. § 924(c) (using or carrying a firearm in relation to a crime of violence).  They contend that under the test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), these two convictions violate the double jeopardy prohibition.[15]  Like the preceding issue, however, the law is settled in this Circuit.  Defendants have no double jeopardy claim.

In *United States v. Parker*, 73 F.3d 48, 55 (5th Cir.), *aff'd*, 104 F.3d 72 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1720 (1997), we also examined this same issue and held as follows:

> This Circuit has acknowledged that the "same elements" test [of *Blockburger*] still controls. *United States v. Martinez*, 28 F.3d 444, 446 (5th Cir.), *cert. denied*, ___ U.S. ____, 115 S. Ct. 281, 130 L.Ed.2d 197 (1994). *Martinez* case held that §§ 1951 and 924(c)(1) passed the *Blockburger* test because § 1951 requires proof of threats or force but not possession of a weapon, while § 924 requires proof that the defendant used or carried a weapon but not that the weapon was used for threat or force.  Additionally, subsequent to *Martinez* this court again addressed the issue in *United States v. Gonzales*, 40 F.3d 735 (5th Cir. 1994), *cert. denied*, ___ U.S. ____, 115 S. Ct. 1716, 131 L.Ed.2d 575 (1995), holding that cumulative sentences imposed pursuant to § 924 are permissible because the legislature intended to authorize such punishments.

---

[15]    Under *Blockburger*, each conviction must require proof of a fact or element that the other does not.  *Blockburger*, 284 U.S. at 304.

*Parker*, 73 F.3d at 55 (footnote omitted).[16]  Finding that Defendants' argument is foreclosed by *Parker*, we hold that the district court committed no error on this issue.


                            III.

***Constitutionality of Hobbs Act and Sufficiency of Evidence in Light of Lopez***

Finally, Miles and Gustus argue that, under the Supreme Court's decision in *Lopez*, the Hobbs Act is both unconstitutional on its face and as applied in this case.  They also argue that the evidence in this case is insufficient to support the finding of "substantial effect" on commerce, which the Defendants argue is required by *Lopez*.

During the pendency of this appeal another panel of this Court decided *United States v. Robinson,* No. 96-11165 (5th Cir. Aug. 8, 1997).  In *Robinson*, this Court relied upon *United States v. Bolton*, 68 F.3d 396 (10th Cir. 1995), *cert. denied*, 116 S. Ct. 966 (1996), which reasons that *Lopez* permits the application of federal law based on a *de minimis* nexus to interstate commerce, provided that the "statute regulates an activity which, through repetition, in aggregate has a substantial effect on interstate commerce." *Bolton*, 68 F.3d at 399.  Finding this reasoning unassailable, the panel in *Robinson* held:

> under the third category of the commerce power described in *Lopez*, the particular conduct at issue

_____

[16]    As to the double jeopardy issue, the original *Parker* panel's holding was affirmed and reinstated by the en banc panel.  *Parker*, 104 F.3d at 73.

                            14

> in any given case need not have a substantial effect upon interstate commerce. Congress is free to act -- and the government to apply the law -- so long as the regulated activity, in the aggregate, could reasonably be sought to substantially effect interstate commerce.

*Robinson*, No. 96-11165, slip op. at 5009.

The argument of Miles and Gustus in the instant case as to the effect of **Lopez** upon the Hobbs Act is almost identical to the contentions of the defendant in **Robinson**. Under the doctrine of stare decisis, we are bound by **Robinson**'s earlier holding. Accordingly, we **AFFIRM** the judgments of conviction and sentences of Gregory Lynn Miles and Gerald Jehoram Gustus.

15

DeMOSS, Circuit Judge, specially concurring.

I concur fully with the per curiam disposition of the alleged *Gaudin* error in Part I of the foregoing opinion and with the disposition of the double jeopardy issue in Part II. As to the issues pertaining to the constitutionality of the Hobbs Act and the sufficiency of the evidence, I also recognize that our decision is controlled by the prior decision of this Court in *United States v. Robinson*, No. 96-11165 (5th Cir. Aug. 8, 1996); however, I find myself in such fundamental disagreement with the conclusions in *Robinson* as to the effect of *United States v. Lopez*, 514 U.S. 549 (1995), on Hobbs Act prosecutions that I must register these contrary viewpoints.

## I.   *United States v. Lopez*

In its *Lopez* decision, the Supreme Court restated certain "first principles" as the foundation upon which it based its analysis of the Commerce Clause. The first of these principles is that the federal government is one of "enumerated powers." *Lopez*, 514 U.S. at 552; *see* U.S. CONST., art. I, § 8. These enumerated powers are few and defined, while the powers which are to remain in state governments are "numerous and indefinite." *Id.* (citing THE FEDERALIST NO. 45, at 292-93 (James Madison) (Clinton Ressiter ed., 1961)). "Just as the separation and independence of the coordinate branches of the federal government serve to prevent the accumulation of excessive power in any one branch, a healthy

balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* (citing *Gregory v. Ashcroft*, 504 U.S. 452, 458 (1991)). This theme of the unique contribution of federalism in our system of government was the key reason for the concurrences of Justices Kennedy and O'Connor in the *Lopez* majority decision. In his concurring opinion, Justice Kennedy, joined by Justice O'Connor, stated:

> The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States.

*Id.* at 576 (Kennedy, J., concurring).

The next first principle which the *Lopez* court cited is that limitations on the commerce power are inherent in the very language of the Commerce Clause itself. *Id.* at 553. "The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824).

The third principle which the *Lopez* court referred to was that the power of the Commerce Clause "is subject to outer limits." *Lopez*, 514 U.S. at 557. Quoting from its decision in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), the Court warned that the scope of interstate commerce power, "must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and

18

remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 557 (quoting *Jones & Laughlin*, 391 U.S. at 37).

Finally, the Court in *Lopez* clearly reaffirmed the principle that the federal government does not have a general police power. *Id.* at 566.

Using these first principles, the Supreme Court in *Lopez* then identified "three broad categories of activity that Congress may regulate under its commerce power." *Id.* at 558. First, Congress may regulate the use of the channels of interstate commerce (hereinafter "*Lopez* Part I"). *Id.* (citing *United States v. Darby*, 312 U.S. 100, 114 (1941) and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964)). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce or persons or things in interstate commerce, even though the threat may come only from intrastate activities ("*Lopez* Part II"). *Id.* (citing *Shreveport Rate Cases*, 234 U.S. 342 (1914); *Southern Ry. Co. v. United States*, 222 U.S. 20 (1911); and *Perez v. United States*, 402 U.S. 146, 150 (1971)). And finally, Congress may regulate those intrastate economic activities having a substantial relation to interstate commerce or those activities that substantially affect interstate commerce ("*Lopez* Part III"). *Id.* at 558-59 (citing *Jones & Laughlin*, 301 U.S. at 37 and *Maryland v. Wirtz*, 392 U.S. 183, 196 n.27 (1968)).

Under this last category, the Court recognized in *Lopez* that

19

its case law had not always been clear as to whether an activity must "affect" or "substantially affect" interstate commerce. Nevertheless, the Court clearly concluded that, "consistent with the great weight of our case law . . . the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id*. at 559.  In reviewing the history of its own decisions relating to the exercise by Congress of the Commerce Clause power, the Court in *Lopez* twice expressly pointed out that it has never said that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities."  *Id.* at 558, 559 (quoting *Wirtz*, 392 U.S. at 197 n.27).

Accordingly, in measuring the constitutionality of a statute under the Part III "substantial effects" test, I read *Lopez* to establish the following subordinate tests, each of which must be satisfied to uphold the constitutionality of a statute under *Lopez* Part III:

1.   Does the regulation control a commercial or economic activity necessary to the regulation of some interstate commercial activity;

2.   Does the statute include a "jurisdictional nexus" requirement to ensure that each regulated instance of the activity substantially affects interstate commerce; and

3.   Does the rationale offered in support of the constitutionality of the statute (*i.e.*, statutory findings, legislative history, arguments of counsel, findings of a trial

20

court, or a reviewing court's determination of the purposes of the statute being challenged) have a logical stopping point which preserves the distinction between what is national and what is local in the activities of commerce.

These three subordinate tests must guide a reviewing court's determination of a statute's constitutionality under *Lopez* Part III.

In the instant case, the government argues that the *Lopez* decision should be confined to its facts. It is obvious that the statute involved in *Lopez*, the Gun Free School Zone Act, 18 U.S.C. § 922(q)(1)(A), is not the same statute as the Hobbs Act. Based upon this distinction, the government contends that "*United States v. Robertson*, [514 U.S. 669] (1995), decided five days after *Lopez*, clearly demonstrates that *Lopez* is limited to the specific facts of that case and that statutes such as the Hobbs Act are constitutional." I see nothing in *Robertson* to support the government's contention.

First, *Robertson* involved a prosecution under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the critical issue was whether the defendant had invested drug proceeds in an enterprise which was "engaged in or affecting interstate commerce" as defined in RICO. In its *Robertson* opinion, the Court held that the defendant had invested in an "enterprise engaged in interstate or foreign commerce." *Robertson*, 514 U.S. at 671. The Court did not mention *Lopez* at all and declined to address whether or not that enterprise "affected

21

interstate commerce." *Id.* Furthermore, my research indicates that the Supreme Court has never addressed the constitutionality of the Hobbs Act as it applies to robberies, nor has the government cited any Supreme Court case that upholds the constitutionality of the Hobbs Act in situations involving robberies.  In fact, the *Lopez* court, in making its historical review of decisions interpreting the Commerce Clause, did not cite any of its decisions involving the Hobbs Act.

Consequently, I would decline the government's invitation to limit the language and analysis of the majority opinion in *Lopez* to a determination of nothing more than the constitutionality of the Gun Free School Zone Act.  I suggest that it is our function as an intermediate federal court to carefully examine the language, reasoning, and analysis of the Supreme Court's *Lopez* decision, and to follow and apply that decision as best we can in this case.

## II.  The Hobbs Act

The present text of the Hobbs Act was adopted more than fifty years ago in 1946.  It amended an Act "to protect trade and commerce against interference by violence, threats, coercion and intimidation," which had previously been adopted in 1934.  In 1942, the United States Supreme Court in *United States v. Local 807 of International Brotherhood of Teamsters*, 315 U.S. 521 (1942), reversed a conviction, under the 1934 Act, of a labor union and some of its members.  The Court held the instructions given by the trial court did not properly explain the language in the Act which

excepted "the payment of wages by a bona fide employer to a bona fide employee" from the prohibitions of the Act.  *Local 807*, 315 U.S. at 537.  This decision precipitated the filing of the bill which ultimately became the Hobbs Act.  The decision caused such a stir in Congress that its entire text was printed in full in the report of the House Committee on the Judiciary which recommended favorable passage of the Hobbs Act.  The text of the Hobbs Act itself does not contain any statutory findings.  The report of the House Judiciary Committee does not contain any legislative findings; it simply states:

1.    "The objective of title I is to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbery or extortion as defined in the bill."  H.R. REP. NO. 79-238, at 1369 (1945).

2.    "In the light of the testimony and admissions contained in the hearings and of the above-quoted provisions of the Constitution, there must be agreement that those persons who have been impeding interstate commerce and levying tribute from free-born American citizens engaged in interstate commerce shall not be permitted to continue such practices without a sincere attempt on the part of Congress to do its duty of protecting interstate commerce."  *Id.* at 1370.

The portions of the Constitution quoted in the committee report were:

1.    "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," *id.*

23

(quoting U.S. CONST., art. I, § 9, cl. 2); and,

2.    "No tax or duty shall be laid on articles exported from any State," *id.* (quoting U.S. CONST., art. I, § 9, cl. 5); and,

3.    "No state shall, without the consent of the Congress, lay any impost or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws...." *Id.* (quoting U.S. CONST., art. 1, § 10, cl. 2).

A careful review of the floor debates and dialogues of members of the House on the subject of the Hobbs Act clearly indicates that Congress sought to address a particular evil by the passage of the Hobbs Act: the practice of certain unions and union members in major cities along the East Coast of the United States, particularly New York City, who would stop trucks which were inbound to those cities carrying loads of produce from neighboring states and force the driver of the truck to either pay in cash a day's wage for a New York City union truck driver or to hire a union truck driver to drive the truck to its destination in New York City. In these congressional debates, the conduct most frequently was labeled "extortion" or "paying of tribute." The term "robbery" was used occasionally, but, more often, the term was "highway robbery," reflecting the speaker's focus on both the location where the stop and "robbery" would occur, and the fact that the individual victims were the drivers of the inbound trucks.[1] In these legislative debates there is absolutely no

---

[1]    *See* 91 CONG. REC. 11,899-922 (1945); *see also* Sam Hobbs, *The Hobbs Anti-Racketeering Bill*, 13 JBA DIST. COLUM. 101-11 (1946). The following are two quotations from the *Congressional Record* of

24

discussion which would indicate an intention on the part of

the House debates, describing the circumstances typically discussed as justifications for the Hobbs Act:

> Here comes a farmer with a load of produce -- milk, butter, eggs, vegetables, potatoes, things he has raised and produced upon his farm. He owns that property. Into it has gone his toil and his sweat, and that of his wife and children, some of whom may accompany him. As they near a State line in going to market to sell the produce a thug they never saw before or a coterie of thugs comes up to the truck and says, "Here, stop your truck." The farmer says, "Why, I do not want to stop my truck. I am going to market." The thug says, "Yes; but you stop your truck now." The farmer asks, "Well, what do you want?" The thug, "I want $9.42 if it is a big truck or $8.41 [if] it is a little truck."
>
> The farmer says, "I don't want to pay it. I don't need your help." The thug says, "Yes; but if you do not pay me I will knock you in the head and knock your child or your wife in the head." Maybe it is the man's wife who is with him. Then, in fear, not wishing to be mutilated or perhaps killed, and not desiring to see his wife and child killed, the farmer pays the money.

91 CONG. REC. 11,911 (1945) (statement of Rep. Jennings).

> Hon. Joe Eastman, then head of the Office of Defense Transportation, told me that his examiners reported 1,000 trucks a night being held up and robbed in various cities of this Union from Los Angeles to Seattle, across through Milwaukee, Chicago, and through Scraton, Pa., which was another hot spot, Philadelphia, New York, and over 100 a day at the New York end of the Holland Tunnel. He was there begging as a witness in 1943, pleading the cause of defense transportation, and called attention to the numbers and numbers of trucks loaded with shells and guns for our Army and Navy which were held up and robbed by those goons at the mouth of the Holland Tunnel.

*Id.* at 11,912 (statement of Rep. Hobbs).

Congress to reach robberies which might occur at the retail locations where the produce might ultimately be delivered. Likewise, there is no discussion in these legislative debates as to what significance, if any, Congress attached to the words "in any way or degree" (which were included in the Hobbs Act, just as they had previously been included in the 1934 Act).

I turn now to the text of the Hobbs Act itself. For purposes relevant to this case, the Hobbs Act states:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery ... or conspires so to do ... shall be fined under this title or imprisoned not more than twenty years or both.
>
> (b) As used in this section --
>
> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession ....
>
> ****
>
> (3) The term "commerce" means ... all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof....

18 U.S.C. § 1951. Giving the words used in the statute their common, ordinary meaning, *Moskal v. United States*, 498 U.S. 103, 108 (1990), I construe the statute as follows:

The gravamen of the offense proscribed by the Hobbs Act is the obstructing, delaying, or affecting of interstate commerce. The words "by robbery" define the cause or method by which the delay, obstruction, or effect on interstate commerce is produced.

The elements of the crime which must be proved beyond a reasonable doubt by the government are (i) the delay, obstruction, or effect on interstate commerce and (ii) that such delay, obstruction, or effect was caused by robbery. The phrase "in any way or degree" modifies the verbs "obstructs, delays, or affects."

The phrase "commerce or the movement of any article or commodity in commerce" is the object of the verbs "obstructs, delays, or affects."

The prepositional phrase "between any point in a State, Territory, Possession or the District of Columbia and any point outside thereof" is the essential element of the definition of "commerce" in subparagraph (b)(3); if that prepositional phrase is inserted after the word "commerce" (where it appears in two places in the opening sentence of subparagraph (a)), a clearer sense of the prohibited conduct is apparent.

The dictionary definition of "commerce" is "an interchange of goods or commodities between different countries or between areas of the same country; trade." WEBSTER'S COLLEGE DICTIONARY 272 (1991). The definition of the term "trade" is "the act or process of buying, selling, or exchanging commodities at either wholesale or retail, within a country or between countries." *Id.* at 1413. "Affect" primarily means "to produce an effect or change in." *Id.*

27

at 23. The dictionary definition of the noun "effect" is "something that is produced by an agency or cause; result; consequence." *Id.* at 426. Applying these common, everyday definitions, I conclude that the word "commerce," as used in the Hobbs Act, clearly means an activity or process between a point in one state and a point in another state. The verbs "delay, obstruct, or affect" make good sense if the word "commerce" is read to mean such an activity or process. Neither the verb "delay" nor the verb "obstruct" makes good sense if the word "commerce" is construed to mean "an entity engaged in commerce."

Finally, I note that there is nothing in the language of the Hobbs Act that purports to define "who" might be the victim of the robbery as defined therein. Nor is there any language that purports to define "who" might be engaging in the interstate commerce defined therein.

## III. Constitutionality of the Hobbs Act Under *Lopez* Part I

Taking into consideration the plain language of the Hobbs Act itself, the insights given by its legislative history, and the language of the Supreme Court in *Lopez*, I pass quickly over *Lopez* Part I because I can see no basis in law or fact for finding that the food outlets where the robberies occurred in this case were channels of interstate commerce. The meaning of the term "channel of interstate commerce," *Lopez*, 514 U.S. at 558, must refer to the navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the interstate highway system;

28

the interstate pipeline systems; interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies; and satellite communication frequencies on, over, and through which flow the goods, commodities, and information which constitute commerce between places in different states. There is no evidence or testimony whatsoever in this case that would permit a conclusion that any of the retail food outlets in this case constituted "a channel of interstate commerce." Under Part I of *Lopez*, therefore, the Hobbs Act is facially constitutional, but nothing supports the constitutionality of the Hobbs Act as applied to the facts in this case.

## IV. Constitutionality of the Hobbs Act Under *Lopez* Part II

Under Part II of *Lopez*, the Supreme Court recognized that Congress is empowered "to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Lopez*, 514 U.S. at 558. As indicated by the cases cited by the Supreme Court in identifying Part II powers, I read the term "instrumentalities of interstate commerce" to refer to trains, planes, cars, trucks, boats, and other vehicles by which people or commodities move in a channel of commerce; I read the term "persons in commerce" to mean passengers, travelers, operators, or crew members on the instrumentalities of interstate commerce; and I read the term "things in interstate commerce" to mean the goods or commodities being transported as cargo in

29

interstate commerce. I note that the Supreme Court used the verb "protect" as well as the verb "regulate" in defining Part II.

Clearly under Part II of *Lopez*, the Hobbs Act is facially constitutional as an exercise of congressional power to regulate and protect the instrumentalities, people, and goods actually moving in interstate commerce from robberies. Yet there is no evidence or testimony in this case which could support a conclusion that any "instrumentality of commerce," any "persons . . . in interstate commerce," or any "things in interstate commerce" were "obstruct[ed], delay[ed], or affect[ed]" by the subject robberies.

In the Hobbs Act, the term "robbery" is defined as "[t]he unlawful taking or obtaining of personal property from the person against his will by force, or violence." 18 U.S.C. § 1951(b)(1). How can a robbery delay, obstruct, or affect commerce or the movement of any article or commodity in commerce? Obviously, if the "personal property" which is taken as part of the robbery is itself a commodity "in interstate commerce," then there could be an obstruction of the movement in interstate commerce of that commodity, regardless of the quantity or value of that commodity which was taken. Likewise, if the person who is robbed is, himself, "in interstate commerce" (either as a passenger or a traveler, or as an operator or crew member of an instrumentality of interstate commerce operating in interstate commerce), then whatever is taken from that person (whether it be cash money, watches, jewelry, or credit cards, regardless of the quantity, number, or value, thereof) could constitute an effect on commerce

30

because Congress intended that such passenger, traveler, operator, or crew member would be protected while in interstate commerce. These are the very circumstances and events which the legislative history shows that Congress clearly had in mind when it passed the Hobbs Act. These are also the circumstances which are compelled by the plain, common-sense reading of the words of the Hobbs Act.

Thus, under Part II of *Lopez*, what was taken in the robbery, and the person from whom such property was taken, determine whether the robbery "delay[ed], obstruct[ed], or affect[ed] interstate commerce." In each of the robberies involved in this appeal, what was taken was cash from the cash register or safe of a retail fast food outlet. From where did this cash come? It came from customers as the proceeds from sales conducted on the premises of the fast food outlets after these customers paid cash money over the counter for the food products available. These customers were the final retail consumers of these food products. These sales transactions were exclusively local and *intrastate* in nature and were taxable by the State of Texas under its general sales tax. Both seller and buyer were in the same place and the transfer of possession took the form of hand-to-hand and person-to-person exchange, both as to the food product being sold and bought and as to the money being given therefor as consideration. I would conclude, then, that as a matter of law, the money taken from the cash register was not a commodity or product moving in interstate commerce.

Likewise, the persons from whom this cash was taken do not qualify as persons "in interstate commerce." In this case, there is absolutely no evidence that any interstate passenger or traveler was even present on the occasion of any robbery, much less that any such passenger or traveler was actually robbed of any of his personal property. In one instance, there is testimony that the driver of a delivery truck was present during one of the robberies. Yet, as to this occasion, there is no testimony (i) that this driver was making any kind of interstate delivery, nor (ii) that any of the product which he was delivering was taken in the robbery, nor (iii) that any of his personal property was taken. Because the employees of the fast food outlet were obviously present during the robberies, the critical question becomes whether these employees can be considered operators or crew members of any instrumentality of interstate commerce. I think not. An instrumentality of interstate commerce is something which effectuates the movements of goods, commodities, or information from a place in one state to a place in another state. In the case of goods and commodities, the essential features of an instrumentality are its abilities to move and to transport such commodities. The fast food outlets in this case have neither essential feature. Consequently, because neither the cash which was taken, nor the persons from whom the cash was taken, meet the test of being "in interstate commerce," I conclude that the evidence in this case is wholly

insufficient to support a finding under *Lopez* Part II that the robberies at issue "delay[ed], obstruct[ed], or affect[ed]" interstate commerce.

## V. Constitutionality of the Hobbs Act Under *Lopez* Part III

With respect to *Lopez* Part III, the Supreme Court recognized in *Lopez* that its case law had not always been clear as to whether an activity must merely "affect" or "substantially affect" interstate commerce to be within Congress's regulatory power. *Lopez*, 514 U.S. at 559. However, the Court clearly concluded that "consistent with the great weight of our case law . . . the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* In reviewing the history of its own decisions relating to the exercise by Congress of its Commerce Clause power, the Court in *Lopez* stressed that it "has never declared that 'Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.'" *Id.* (quoting *Wirtz*, 392 U.S. at 196 n.27).

Prior to the decision in *Robinson*, our Circuit tested two other criminal statutes against *Lopez*'s requirement of a substantial effect on interstate commerce. In *United States v. Kirk*, 105 F.3d 997 (5th Cir. 1997) (en banc), *petition for cert. filed*, 65 U.S.L.W. 3756 (U.S. May 5, 1997) (No. 96-1759), an equally divided en banc court affirmed a conviction for intrastate possession of a machine gun, 18 U.S.C. § 992(o). Three opinions

33

were filed by various judges of this Court, two opinions (endorsed by a combination of eight judges) upholding the constitutionality of § 922(o), and one opinion (endorsed by eight other judges) holding that § 922(o) did not satisfy the test of **Lopez** Part III. It is important to note, however, that each and every opinion in **Kirk** recognized that **Lopez** required the use of the adverb "substantially" in testing whether an effect on commerce passed constitutional muster. *See* **Kirk**, 105 F.3d at 978 (opinion of Parker, J.), 999-1000 (opinion of Higginbotham, J.), 1008 (opinion of Jones, J.).

Subsequently, in **United States v. Corona**, 108 F.3d 565 (5th Cir. 1997), we upheld the constitutionality of a federal criminal statute involving purely intrastate activity under the third **Lopez** category by reading into the statute a requirement that the intrastate activity involved must *substantially* affect interstate commerce. The **Corona** decision affirmed an arson conviction involving the burning of a building rented by a taxi company. In addition to its customary purely local trips, the taxi company offered transportation to interstate travelers arriving at an airport. We reasoned that Congress could criminalize the specific activity involved, *i.e.*, the burning of a taxi company warehouse, because destruction of such a building could have a substantial effect upon interstate commerce. **Corona**, 108 F.3d at 571.

We also concluded that under **Lopez**, Congress cannot constitutionally make all arsons federal crimes; only those arsons which substantially affect interstate commerce are subject to

34

federal regulation. The prosecution of other arsons is solely a state concern. Thus an element of the crime of federal arson is that the defendant's actions had a substantial effect upon interstate commerce. This of course requires a case-by-case analysis. We analyzed the evidence in *Corona* and concluded that the burning of a taxi-cab warehouse had such an effect and was therefore a federal crime. 18 U.S.C. § 844(i).

*Corona* is important to our consideration of the Hobbs Act because, like the Hobbs Act, the arson statute does not expressly require that the activity regulated must have a "substantial" effect upon interstate commerce.[2] *Lopez* imposes the same requirement for a constitutional prosecution of robbery under the Hobbs Act: the robbery must have a substantial effect upon interstate commerce to constitute a federal crime.

I would apply the same reasoning in testing the facial constitutionality of the Hobbs Act under the third category of *Lopez*. I would hold that the Hobbs Act is constitutional as applied to a robbery or a robbery conspiracy only if the robbery *substantially* affects interstate commerce. To the extent that the Hobbs Act is read to make it a federal crime to commit a robbery which affects interstate commerce "in any [insubstantial or *de minimis*] way or degree," it is unconstitutional under *Lopez*.

---

[2]    Under the arson statute, the property involved must be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i).

35

I recognize that my conclusion conflicts with our Circuit's decision in **Robinson** and with the decisions of other circuits which have also rejected the "substantial effect" test with respect to the Hobbs Act.[3]  Respectfully, I think that our application of the "substantial effect" test to the arson statute in **Corona** and to § 922(o) in **Kirk** mandates our application of the "substantial effect" test to the Hobbs Act.  The decision in **Robinson** is in conflict with our prior holdings.

## VI.  Sufficiency of the Evidence

The district court denied Defendants' motion for judgment of acquittal, which was made at the end of the government's case-in-chief and renewed at the close of evidence.  The court relied upon then-Circuit precedent that a *de minimis* effect upon interstate commerce was sufficient to sustain a conviction under the Hobbs Act.  *See* **United States v. Collins**, 40 F.3d 95, 99 (5th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995); **United States v. Stephens**, 964 F.2d 424, 429 (5th Cir. 1992); **United States v. Wright**, 804 F.2d 843, 844 (5th Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987).  However, in my view, **Lopez** controls, and the "substantial effects" standard applies.

---

[3]    On the other hand, I am not alone in the belief that **Lopez** calls for genuine review under the substantial-effect standard. *See, e.g.*, **United States v. Wall**, 92 F.3d 1444 (6th Cir. 1996) (Boggs, J., dissenting). *Cf.* **United States v. Nguyen**, 117 F.3d 796, 798-800 (5th Cir. 1997) (Jones, J., dissenting) (advocating the application of the substantial effects standard to review of a conviction under the federal arson/explosion statute, 18 U.S.C. § 844(i)).

The dictionary gives two primary meanings for "substantial":

1. "of ample or considerable amount, quantity, size, etc.," and

2. "of a corporeal or material nature; real or actual." WEBSTER'S COLLEGE DICTIONARY, *supra*, at 1332. One meaning is quantitative, the other is qualitative. Both meanings are necessary to fulfill the function which the Supreme Court must have intended under *Lopez* III.

The quantitative meaning (*i.e.*, ample amount) harmonizes with the Supreme Court's statement in *Lopez* that "a relatively trivial impact on commerce" cannot be used "as an excuse for broad general regulation of state or private activities." *Lopez*, 514 U.S. 558 (quoting *Wirtz*, 392 U.S. at 196 n.27). The qualitative meaning (*i.e.*, real or actual) is necessary to fix the "outer limits" of the Commerce Clause. *Id.* at 557. If an effect on commerce need only be hypothetical or conjectural or speculative or assumable, then for all practical purposes, the requirement of an effect on commerce is unlimited -- it extends to the broadest reach of the human imagination.

Imaginative prosecutors and judges have produced the concepts of "*de minimis* effect" and "depletion of assets," both of which rest upon a speculative and conjectural assumption of an effect on interstate commerce. I cannot reconcile these concepts, which our Court in *Robinson* reaffirmed, with the new rule of *Lopez*; the effect of the regulated activity on interstate commerce must be substantial, that is, considerable in amount and real or actual in

37

nature.  In **Lopez**, the Supreme Court expressly rejected the "cost of crime" and "national productivity" theories which the government offered in support of the constitutionality of the Gun Free School Zones Act.  *See **id**.* at 564-67.  I would hold that the "*de minimis* effect" and the "depletion of assets" theories should be similarly rejected.

The evidence in this case, even when viewed in a light most favorable to the verdict, is not sufficient to establish that the Defendants' activities in any of the robberies had a substantial effect upon interstate commerce.

There is testimony in this record from which a jury could reasonably conclude that each of these fast food outlets bought ingredients from out-of-state suppliers; however, there is no testimony, whatsoever, in this record upon which a jury could reasonably conclude (or a judge determine as a matter of law) that any of those purchases of ingredients were affected by the robberies.  There is testimony in this record upon which a jury could reasonably conclude that these fast food outlets occasionally served customers who travel in interstate commerce; however, there is no testimony, whatsoever, in this record upon which a jury could reasonably conclude (or a judge determine as a matter of law) that the service of such interstate customers was substantially affected by the robberies.  There is evidence in this record upon which a jury could reasonably conclude that, for relatively short periods of time (thirty minutes to two hours), these fast food outlets were closed following the occurrence of these robberies; however, there

is absolutely no testimony in this record upon which a jury could reasonably conclude (or a judge determine as a matter of law) that such closures substantially affected interstate commerce.[4] There is testimony in this record upon which the jury could have reasonably concluded that the McDonald's franchise outlet would send rent payments and service fees to the McDonald's headquarters in Chicago; however, there is absolutely no evidence in this record upon which the jury could reasonably conclude (or a judge determine as a matter of law) that such payments were obstructed, delayed, or affected by the robberies. There is evidence in this record upon which the jury could reasonably conclude that the employees at the company-owned McDonald's outlets received their paychecks from out of state; however, there is absolutely no testimony in this record upon which the jury could reasonably conclude (or a judge determine as a matter of law) that the receipt of such paychecks was obstructed, delayed, or affected by the robberies.

The government tried these Defendants on the theory that the Hobbs Act required the government to prove only that (i) the Defendants committed a robbery, and (ii) the fast food outlets where the robberies occurred had some *de minimis* connection with interstate commerce. Under the government's theory, the second element could be proven by establishing that: the fast food outlets received, from out-of-state sources, ingredients which they used in

---

[4] This is true for two reasons. First, there is not a shred of testimony that identifies the sales that might have been lost. Second, and more critically, any sales that might have been lost would have been local in nature.

39

their fast food products; employees in these fast food outlets were paid with checks that were sent from out-of-state sources; proceeds from sales of fast food products at these outlets would be sent to a local bank for forwarding to a home office outside of the State of Texas; these fast food outlets were located on major thoroughfares and highways; and these fast food outlets sometimes served customers who traveled in interstate commerce. Under the government's theory, proof of these factual circumstances would be sufficient because under Circuit Court precedents, these circumstances would permit the district judge to infer or assume, as a matter of law, that there was a *de minimis* effect on commerce. Under this theory, such an inference would not require proof that any actual effect had in fact occurred. In my view, the facts and circumstances proven by the government, *i.e.*, that the fast food outlets involved "bought and sold merchandise that had traveled from another state to Texas," do not constitute direct evidence that the robbery caused any obstruction, delay, or effect on commerce. Nor do these facts permit a reasonable inference to that effect. As a matter of fact, the witness tendered by the government in this case to establish these out-of-state purchases admitted on cross-examination that the robbery did not affect those purchases. If the purchase of ingredients from out-of-state sources was not affected by the robbery, then proof that out-of-state purchases were made cannot have any logical bearing on whether there was an effect on commerce. The same is true for each of the other circumstances referred to by the government in its

40

brief and relied upon by the district court in its instruction to the jury.

In reality, what the *de minimis* concept does is permit the Hobbs Act to be read as if it said "whoever robs a business engaged in interstate commerce shall be fined hereunder or imprisoned for twenty years or both." This interpretation permits conviction upon proof that goods were bought or sold in interstate commerce, customers traveled between states, or sales proceeds were transferred from one state to another. Obviously, this is not what the Hobbs Act states.

Furthermore, if the Hobbs Act is construed to prohibit robberies of any business engaged in interstate commerce, and if "being engaged in interstate commerce" means no more than that a business buys something from an interstate supplier or sells something to an interstate traveler, then such judicial interpretation extends the Hobbs Act to robberies of almost every business establishment in this land. If the *de-minimis*-effect-on-commerce test is still good law after **Lopez**, then **Robinson** and the instant case mean that the Hobbs Act will be similarly applicable to drug stores, grocery stores, ice cream shops, barber shops, beauty shops, jewelry stores, video stores, auto parts stores, liquor stores, pawn shops, and cleaners and pressers. All of these are frequent targets of robbers. Almost every one of these businesses will have some inventory from out of state and customers who could be traveling between states.

41

The *de-minimis*-effect-on-commerce concept, therefore, violates two of the first principles articulated by the Supreme Court in *Lopez*:

1.    that the federal government does not have a general police power, *Lopez*, 514 U.S. at 561 n.3; and,

2.    that "[t]he scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local.'"   *Id.* at 557 (quoting *Jones & Laughlin*, 301 U.S. at 37).

The prosecution of local crimes is generally considered to be a state function.  This is borne out by the circumstances of the way the robberies in this case were investigated.  There is no evidence that the Federal Bureau of Investigation, the Drug Enforcement Agency, the Bureau of Alcohol, Tobacco, and Firearms, or any other federal agency had anything to do with the initial investigation of any of these robberies.  Nor were they involved with the initial identification and apprehension of the Defendants. Detectives from the local police department in the county where these robberies occurred obtained statements from the victim witnesses, took fingerprints at the scene, and ultimately secured a written confession from one of the Defendants.  All indications pointed toward a speedy and successful prosecution of these Defendants under Texas law, and Texas statutes provide for the

42

enhancement of sentences for repeat offenders and career criminals. Indeed, prior to the federal trial, both Defendants had been convicted in state proceedings for other similar robberies and were in state prison serving sentences of fifty years or life without parole. The State of Texas did all of the initial investigatory work and was prepared to go forward with state prosecutions as to the particular robberies in this case.

For the foregoing reasons, I conclude that the Hobbs Act is constitutional as applied to three types of robberies: those which occur in or involve the use of a channel of interstate commerce, those which involve persons or things in interstate commerce, and those robberies which have a substantial effect upon interstate commerce. But the Hobbs Act can no longer be constitutionally applied to robberies which produce only a *de minimis* effect upon interstate commerce, such as those for which the Defendants were convicted in this case. The evidence, when viewed in the light most favorable to the government, falls short of establishing that these Defendants *substantially* obstructed, delayed, or affected interstate commerce or the movement of any article or commodity in commerce, by robbery or conspiracy to commit robbery.

Accordingly, were I free of the precedent of this Circuit as announced in **United States v. Robinson**, I would reverse the judgments of conviction and sentences of Defendants and remand the case to the district court with instructions to dismiss the indictments.

43